FLORIDA POWER & LIGHT CO. *v.* INTERNA-
TIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL 641, ET AL.

No. 73–556.   Argued April 24, 1974—Decided June 24, 1974*

*Together with No. 73–795, *National Labor Relations Board* v.
*International Brotherhood of Electrical Workers, AFL–CIO, et al.,*
also on certiorari to the same court.

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, and POWELL, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 813.

*Ray C. Muller* argued the cause and filed a brief for petitioner in No. 73–556. *Norton J. Come* argued the cause for petitioner in No. 73–795 and for respondent National Labor Relations Board in No. 73–556. With him on the brief were *Solicitor General Bork, Peter G. Nash, John S. Irving,* and *Patrick Hardin.*

*Laurence J. Cohen* argued the cause for respondent unions in both cases. With him on the brief were *Robert E. Fitzgerald* and *Seymour A. Gopman.*

*Laurence Gold* argued the cause for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance. With him on the brief were *J. Albert Woll* and *Thomas E. Harris.*†

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 8 (b)(1)(B) of the National Labor Relations Act, 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(B), makes it an unfair labor practice for a union "to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." The respondent unions in these consolidated cases called economic strikes against the employer companies. During the strikes, supervisory employees of the companies, some of whom were members of bargaining units and some of whom were not, but all of whom were union members, crossed

---

†*Lawrence T. Zimmerman* filed a brief for the Graphic Arts Union Employers of America, a Division of the Printing Industries of America, Inc., as *amicus curiae* urging reversal.

the picket lines and performed rank-and-file struck work, *i. e.,* work normally performed by the nonsupervisory employees then on strike. The unions later disciplined these supervisors for so doing. The question to be decided is whether the unions committed unfair labor practices under § 8 (b)(1)(B) when they disciplined their supervisor-members for crossing the picket lines and performing rank-and-file struck work during lawful economic strikes against the companies.

I

Since 1909, Local 134, International Brotherhood of Electrical Workers, AFL–CIO, one of the respondents in No. 73–795, has been recognized by the Illinois Bell Telephone Co. (Illinois Bell) and its predecessors as the exclusive bargaining representative for both rank-and-file and certain supervisory personnel, including general foremen, P. B. X. installation foremen, and building cable foremen. Rather than exercise its right to refuse to hire union members as supervisors, the company agreed to the inclusion of a union security clause in the collective-bargaining agreement which required that these supervisors, like the rank-and-file employees, maintain membership in Local 134. In addition, the bargaining agreement in effect at the time of this dispute contained provisions for the conditions of employment and certain wages of these foremen.

Other higher ranking supervisors, however, were neither represented by the union for collective-bargaining purposes nor covered by the agreement, although they were permitted to maintain their union membership.[1]

---

[1] Under a Letter of Understanding signed by Illinois Bell and Local 134 in 1954 and reaffirmed in 1971, it was provided:

"As District Installation Superintendents and District Construction Supervisors their wages and conditions of employment will not

By virtue of that membership, these supervisors, like those within the bargaining units, received substantial benefits, including participation in the International's pension and death-benefit plans and in group life insurance and old-age-benefit plans sponsored by Local 134.

Under the International's constitution, all union members could be penalized for committing any of 23 enumerated offenses, including "[w]orking in the interest of any organization or cause which is detrimental to, or opposed to, the I. B. E. W.," App. 76, and "[w]orking for any individual or company declared in difficulty with a [local union] or the I. B. E. W." *Id.,* at 77.

Between May 8, 1968, and September 20, 1968, Local 134 engaged in an economic strike against the company. At the inception of the strike, Illinois Bell informed its supervisory personnel that it would like to have them come to work during the stoppage but that the decision whether or not to do so would be left to each individual, and that those who chose not to work would not be penalized. Local 134, on the other hand, warned its supervisor-members that they would be subject to disciplinary action if they performed rank-and-file work during the strike. Some of the supervisor-members crossed the union picket lines to perform rank-and-file struck work. Local 134 thereupon initiated disciplinary proceedings against these supervisors, and those found guilty were

---

be a matter of union-management negotiations but they will not be required to discontinue their membership in the union as it is recognized that they have accumulated a vested interest in pension and insurance benefits as a result of their membership in the union. However, any allegiance they owe to the union shall not affect their judgment in the disposition of their supervisory duties. Since they will have under their supervision employees who are members of unions other than Local 134 and perhaps some with no union affiliations whatever, the company will expect the same impartial judgment that it demands from all Supervisory personnel." App. 113.

fined $500 each.[2] Charges were then filed with the NLRB by the Bell Supervisors Protective Association, an association formed by five supervisors to obtain counsel for and otherwise protect the supervisors who worked during the strike. The Board, one member dissenting, held that in thus disciplining the supervisory personnel, the union had violated § 8 (b)(1)(B) of the Act,[3] in accord with its decision of the same day in *Local 2150, IBEW (Wisconsin Electric Power Co.)*, 192 N. L. R. B. 77 (1971), enforced, 486 F. 2d 602 (CA7 1973), cert. pending No. 73–877, holding:

> "The Union's fining of the supervisors who were acting in the Employer's interest in performing the struck work severely jeopardized the relationship between the Employer and its supervisors.
>
> .        .        .        .        .
>
> "The purpose of Section 8 (b)(1)(B) is to assure to the employer that its selected collective-bargaining representatives will be completely faithful to its desires. This cannot be achieved if the union has an effective method, union disciplinary action, by which it can pressure such representatives to deviate from the interests of the employer. . . ." 192 N. L. R. B., at 78.

Accordingly, the Board ordered the unions to rescind the fines, to expunge all records thereof, and to reimburse the supervisors for any portions of the fines paid.

The Florida Power & Light Co. (Florida Power), the petitioner in No. 73–556, has maintained a collective-bargaining agreement with the International

---

[2] Local 134 also imposed fines of $1,000 upon each of the five supervisors who had formed the Bell Supervisors Protective Association.

[3] *International Brotherhood of Electrical Workers, AFL–CIO, and Local 134*, 192 N. L. R. B. 85 (1971) (hereinafter *Illinois Bell*).

Brotherhood of Electrical Workers, AFL–CIO and Locals 641, 622, 759, 820, and 1263, represented by the System Council U–4,[4] since 1953. That agreement does not require employees to become union members as a condition of employment, but many of its supervisory personnel have in fact joined the union. The company has elected to recognize the union as the exclusive bargaining representative of these supervisors, and certain aspects of their wages and conditions of employment are provided for in the agreement.[5] In addition, other higher supervisory personnel not covered by the agreement were allowed to maintain union membership,[6] and, although not represented by the union for collective-bargaining purposes, received substantial benefits as a result of their union membership, including pension, disability, and death benefits under the terms of the International's constitution.

---

[4] System Council U–4 was named as a respondent in the complaint, but the Board dismissed all charges against it and entered an order only against the local unions.

[5] Supervisory employees thus included are district supervisors, assistant district supervisors, assistant supervisors, plant superintendents, plant supervisors, assistant plant superintendents, distribution assistants, results assistants, assistant plant engineers, and subsection supervisors.

[6] In both *Illinois Bell* and this case, some of the supervisors involved, though union members, did not actively participate in union affairs and paid no dues. This was because they held "honorary" withdrawal cards, permitting them to return to active membership without paying normal initiation fees in the event they returned to rank-and-file work. These cards also permitted their holders to continue participation in the International's death-benefit fund. Other supervisors held "participating" withdrawal cards under which they continued to pay a fee equal to the monthly dues and remained eligible for pension, death, and disability benefits. The holders of these cards were also not permitted to participate in other union affairs.

Since the same International union was involved in both No. 73–556 and No. 73–795, the union members of Florida Power bore the same obligations under the International's constitution as did the union members of Illinois Bell. See *supra,* at 793. With respect to union discipline of supervisor members, however, the Florida Power collective-bargaining agreement itself provided:

> "It is further agreed that employees in [supervisory] classifications have definite management responsibilities and are the direct representatives of the Company at their level of work. Employees in these classifications and any others in a supervisory capacity are not to be jacked up or disciplined through Union machinery for the acts they may have performed as supervisors in the Company's interest. The Union and the Company do not expect or intend for Union members to interfere with the proper and legitimate performance of the Foreman's management responsibilities appropriate to their classification. . . ." App. 47.

From October 22, 1969, through December 28, 1969, the International union and its locals engaged in an economic strike against Florida Power. During the strike, many of the supervisors who were union members crossed the picket lines maintained at nearly all the company's operation facilities, and performed rank-and-file work normally performed by the striking nonsupervisory employees. Following the strike, the union brought charges against those supervisors covered by the bargaining agreement as well as those not covered, alleging violations of the International union constitution. Those found guilty of crossing the picket lines to perform rank-and-file work, as opposed to their usual supervisory functions, received fines ranging from $100 to $6,000 and most were expelled from the union, thereby

terminating their right to pension, disability, and death benefits. Upon charges filed by Florida Power, the Board, in reliance upon its prior decisions in *Wisconsin Electric* and *Illinois Bell*, held that the penalties imposed "struck at the loyalty an employer should be able to expect from its representatives for the adjustment of grievances and therefore restrained and coerced employers in their selection of such representatives," in violation of § 8 (b)(1)(B) of the Act. Accordingly, the Board ordered the union to cease and desist, to rescind and refund all fines, to expunge all records of the disciplinary proceedings, and to restore those disciplined to full union membership and benefits.[7]

The *Illinois Bell* case was first heard by a panel of the Court of Appeals for the District of Columbia Circuit, 159 U. S. App. D. C. 242, 487 F. 2d 1113 (1973), and then on rehearing was consolidated with *Florida Power* and considered en banc. In a 5–4 decision, the court held that "[s]ection 8 (b)(1)(B) cannot reasonably be read to prohibit discipline of union members—supervisors though they be—for performance of rank-and-file struck work," 159 U. S. App. D. C. 272, 300, 487 F. 2d 1143, 1171 (1973), and accordingly refused to enforce the Board's orders.[8] Section 8 (b)(1)(B), the court held, was intended to proscribe only union efforts to discipline supervisors for their actions in representing management in collective bargaining and the adjustment of grievances. It was the court's view that when a supervisor forsakes his supervisory role to do work normally performed by nonsupervisory employees, he no longer acts as a managerial representative and hence "no longer merits any immunity from discipline." *Id.,* at 286, 487 F. 2d, at 1157. We granted

---

[7] *International Brotherhood of Electrical Workers System Council U–4,* 193 N. L. R. B. 30, 31 (1971) (hereinafter *Florida Power*).

[8] 159 U. S. App. D. C. 272, 487 F. 2d 1143 (1973).

certiorari, 414 U. S. 1156, to consider an important and novel question of federal labor law.

## II

Section 8 (b) of the National Labor Relations Act provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."

The basic import of this provision was explained in the Senate Report as follows:

"[A] union or its responsible agents could not, without violating the law, coerce an employer into joining or resigning from an employer association which negotiates labor contracts on behalf of its members; also, this subsection would not permit a union to dictate who shall represent an employer in the settlement of employee grievances, or to compel the removal of a personnel director or supervisor who has been delegated the function of settling grievances." [9]

For more than 20 years after § 8 (b)(1)(B) was enacted in 1947, the Board confined its application to situations clearly falling within the metes and bounds of the statutory language. Thus, in *Los Angeles Cloak Joint Board ILGWU (Helen Rose Co.)*, 127 N. L. R. B. 1543 (1960), the Board held that § 8 (b)(1)(B) barred a union from picketing a company in an attempt to force the employer to dismiss an industrial relations consultant thought to be hostile to the union. See also *Local*

---

[9] S. Rep. No. 105, 80th Cong., 1st Sess. (hereinafter Senate Report), pt. 1, p. 21 (1947).

*986, Miscellaneous Warehousemen, Drivers & Helpers (Tak-Trak, Inc.)*, 145 N. L. R. B. 1511 (1964); *Southern California Pipe Trades District Council No. 16 (Paddock Pools of California, Inc.)*, 120 N. L. R. B. 249 (1958). Similarly, the Board held that § 8 (b)(1)(B) was violated by union attempts to force employers to join or resign from multi-employer bargaining associations, *United Slate, Tile & Composition Roofers, Local 36 (Roofing Contractors Assn. of Southern California)*, 172 N. L. R. B. 2248 (1968); *Orange Belt District Council of Painters No. 48 (Painting & Decorating Contractors of America, Inc.)*, 152 N. L. R. B. 1136 (1965); *General Teamsters Local Union No. 324 (Cascade Employers Assn., Inc.)*, 127 N. L. R. B. 488 (1960), as well as by attempts to compel employers to select foremen from the ranks of union members, *International Typographical Union & Baltimore Typographical Union No. 12 (Graphic Arts League)*, 87 N. L. R. B. 1215 (1949); *International Typographical Union (American Newspaper Publishers Assn.)*, 86 N. L. R. B. 951 (1949), enforced, 193 F. 2d 782 (CA7 1951); *International Typographical Union (Haverhill Gazette Co.)*, 123 N. L. R. B. 806 (1959), enforced, 278 F. 2d 6 (CA1 1960), aff'd by an equally divided Court, 365 U. S. 705 (1961).[10]

In 1968, however, the Board significantly expanded the reach of § 8 (b)(1)(B), with its decision in *San Fran-*

_____

[10] The *Haverhill Gazette* case was typical. There the union had demanded the inclusion of a "foreman clause" providing that the composing room foreman, who had the power to hire, fire, and process grievances, must be a member of the union, although he would be exempted from union discipline in certain circumstances for activities on behalf of management. As the Court of Appeals pointed out: "Not only would the clause . . . limit the employers' choice of foremen to union members, but it would also give the unions power to force the discharge or demotion of a foreman by expelling him from the union." 278 F. 2d, at 12.

cisco-Oakland Mailers' Union No. 18 (*Northwest Publications, Inc.*), 172 N. L. R. B. 2173. In that case, three union-member foremen were expelled from the union for allegedly assigning bargaining unit work in violation of the collective-bargaining agreement. Despite the absence of union pressure or coercion aimed at securing the replacement of the foremen, the Board held that the union had violated § 8 (b)(1)(B) by seeking to influence the manner in which the foremen interpreted the contract:

> "That Respondent may have sought the substitution of attitudes rather than persons, and may have exerted its pressures upon the Charging Party by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering with the Charging Party's control over its representatives. Realistically, the Employer would have to replace its foremen or face *de facto* nonrepresentation by them." 172 N. L. R. B. 2173.

Subsequent Board decisions extended § 8 (b)(1)(B) to proscribe union discipline of management representatives both for the manner in which they performed their collective-bargaining and grievance-adjusting functions, and for the manner in which they performed other supervisory functions if those representatives also in fact possessed authority to bargain collectively or to adjust grievances. See *Detroit Newspaper Printing Pressmen's Union 13*, 192 N. L. R. B. 106 (1971); *Meat Cutters Union Local 81*, 185 N. L. R. B. 884 (1970), enforced, 147 U. S. App. D. C. 375, 458 F. 2d 794 (1972); *Houston Typographical Union 87*, 182 N. L. R. B. 592 (1970); *Dallas Mailers Union Local 143* (*Dow Jones Co., Inc.*), 181 N. L. R. B. 286 (1970), enforced, 144 U. S. App. D. C. 254, 445 F. 2d 730 (1971); *Sheet Metal Workers' Interna-*

*tional Assn., Local Union 49 (General Metal Products, Inc.)*, 178 N. L. R. B. 139 (1969), enforced, 430 F. 2d 1348 (CA10 1970); *New Mexico District Council of Carpenters & Joiners of America (A. S. Horner, Inc.)*, 176 N. L. R. B. 797 and 177 N. L. R. B. 500 (1969), both enforced, 454 F. 2d 1116 (CA10 1972); *Toledo Locals Nos. 15–P & 272, Lithographers & Photoengravers International (Toledo Blade Co., Inc.)*, 175 N. L. R. B. 1072 (1969), enforced, 437 F. 2d 55 (CA6 1971).[11]

These decisions reflected a further evolution of the *Oakland Mailers* doctrine. In *Oakland Mailers*, the union had disciplined its supervisor-members for an alleged misinterpretation or misapplication of the collective-bargaining agreement, and the Board had reasoned that the natural and foreseeable effect of such discipline was that in interpreting the agreement in the future, the supervisor would be reluctant to take a position adverse to that of the union. In the subsequent cases,

---

[11] In *Toledo Blade*, two supervisors were disciplined by the union for working in a crew smaller than the contractually prescribed minimum and for doing production work in excess of the contractually permitted maximum. These activities occurred during an economic strike. The Trial Examiner, in a holding which foreshadowed the cases now before us, noted that such discipline is an unwarranted interference with the employer's control over its own representatives and

"deprives the employer of the undivided loyalty of the supervisor to which it is entitled. If, therefore, the supervisor has actually been designated as the employer's bargaining or grievance representative . . . the Union's discipline of the supervisor is unquestionably a restraint upon, and coercion of the employer's continuing its selection of, and reliance upon, the supervisor as its bargaining and grievance representative." 175 N. L. R. B., at 1080–1081.

In enforcing the Board's order, the Court of Appeals noted: "This conduct of the union would further operate to make the employees reluctant in the future to take a position adverse to the union, and their usefulness to their employer would thereby be impaired." 437 F. 2d, at 57.

however, the Board held that the same coercive effect was likely to arise from the disciplining of a supervisor whenever he was engaged in management or supervisory activities, even though his collective-bargaining or grievance-adjustment duties were not involved. Through the course of these decisions, § 8 (b)(1)(B) thus began to evolve in the view of the Board and the courts "as a general prohibition of a union's disciplining supervisor-members for their conduct in the course of representing the interests of their employers." *Toledo Locals Nos. 15–P & 272, Lithographers & Photoengravers International,* 175 N. L. R. B., at 1080, or for acts "performed in the course of [their] management duties," *Meat Cutters Union Local 81* v. *NLRB,* 147 U. S. App. D. C., at 377, 458 F. 2d, at 796.[12]

In the present cases, the Board has extended that doctrine to hold that § 8 (b)(1)(B) forbids union discipline of supervisors for performance of rank-and-file work on the theory that the performance of such work during a strike is an activity furthering management's interests.[13]

---

[12] Indeed, in its original panel decision in the instant *Illinois Bell* case, the Court of Appeals spoke of § 8 (b)(1)(B) as prohibiting union discipline of supervisory employees "for actions performed by them within the general scope of their supervisory or managerial responsibilities." 159 U. S. App. D. C. 242, 248, 487 F. 2d 1113, 1119.

[13] As the Court of Appeals for the Seventh Circuit reasoned in enforcing the Board's order in *Wisconsin Electric:*

"What a supervisor's proper functions are when the full complement of employees is at work under the regime of a collective bargaining agreement then in force is not determinative of supervisory responsibility during a strike. Otherwise, with no employees to supervise, many supervisors would simply have no managerial responsibilities during a strike. . . . Insofar as the supervisors work to give the employer added economic leverage, they are acting as members of the management team are expected to act when the employer and union are at loggerheads in their most fundamental of disputes." 486 F. 2d 602, 608 (1973).

We agree with the Court of Appeals that § 8 (b)(1)(B) cannot be so broadly read. Both the language and the legislative history of § 8 (b)(1)(B) reflect a clearly focused congressional concern with the protection of employers in the selection of representatives to engage in two particular and explicitly stated activities, namely collective bargaining and the adjustment of grievances. By its terms, the statute proscribes only union restraint or coercion of an employer "in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances," and the legislative history makes clear that in enacting the provision Congress was exclusively concerned with union attempts to dictate to employers who would represent them in collective bargaining and grievance adjustment.

The specific concern of Congress was to prevent unions from trying to force employers into or out of multi-employer bargaining units.[14] As Senator Taft, cosponsor of the legislation, explained:

"Under this provision it would be impossible for a union to say to a company, 'We will not bargain with you unless you appoint your national employers' association as your agent so that we can bargain nationally.' Under the bill the employer has a right to say, 'No, I will not join in national bargaining. Here is my representative, and this is the man you have to deal with.' I believe the provision is a necessary one, and one which will accomplish substantially wise purposes." 93 Cong. Rec. 3837.

---

[14] Section 8 (b)(1)(B) was in fact a more restrained solution to the problem of multi-employer bargaining than originally proposed. Proposed § 9 (f)(i) of the House bill, H. R. 3020, would have prohibited multi-employer bargaining altogether, see H. R. Rep. No. 245, 80th Cong., 1st Sess. (hereinafter House Report), 8–9, 56 (1947).

That the legislative creation of this unfair labor practice was in no sense intended to cut the broad swath attributed to it by the Board in the present cases is pointed up by the further observation of Senator Taft:

"This unfair labor practice referred to is not perhaps of tremendous importance, but employees cannot say to their employer, 'we do not like Mr. X, we will not meet Mr. X. You have to send us Mr. Y.' That has been done. It would prevent their saying to the employer, 'You have to fire Foreman Jones. We do not like Foreman Jones, and therefore you will have to fire him, or we will not go to work.' " 93 Cong. Rec. 3837.[15]

Nowhere in the legislative history is there to be found any implication that Congress sought to extend protection to the employer from union restraint or coercion when engaged in any activity other than the *selection* of its representatives for the purposes of collective bargaining and grievance adjustment. The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8 (b)(1)(B) only when that discipline may

---

[15] In a similar vein, Senator Ellender observed:

"The bill prevents a union from dictating to an employer on the question of bargaining with union representatives through an employer association. The bill, in subsection 8 (b)(1) on page 14, makes it an unfair labor practice for a union to attempt to coerce an employer either in the selection of his bargaining representative or in the selection of a personnel director or foreman, or other supervisory official. Senators who heard me discuss the issue early in the afternoon will recall that quite a few unions forced employers to change foremen. They have been taking it upon themselves to say that management should not appoint any representative who is too strict with the membership of the union. This amendment seeks to prescribe a remedy in order to prevent such interferences." 93 Cong. Rec. 4143.

adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.

We may assume without deciding that the Board's *Oakland Mailers* decision fell within the outer limits of this test, but its decisions in the present cases clearly do not. For it is certain that these supervisors were not engaged in collective bargaining or grievance adjustment, or in any activities related thereto, when they crossed union picket lines during an economic strike to engage in rank-and-file struck work.[16]

## III

It is strenuously asserted, however, that to permit a union to discipline supervisor-members for performing

---

[16] To hold that union discipline of supervisor-members for performing rank-and-file struck work is not proscribed by § 8 (b) (1) (B) of the Act is *not* to hold that such discipline is expressly permitted by § 8 (b) (1) (A) of the Act, as construed in *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967). The decision in that case is inapposite where the union seeks to fine not employee-members but supervisor-members, who are explicitly excluded from the definition of "employee" by § 2 (3), 29 U. S. C. § 152 (3), and hence from the coverage of § 8 (b) (1) (A). See *Beasley* v. *Food Fair of North Carolina, Inc.,* 416 U. S. 653 (1974). The Act, therefore, neither protects nor prohibits union discipline of supervisor-members for engaging in rank-and-file struck work. In light of the fact that "Congress has been rather specific when it has come to outlaw particular economic weapons on the part of unions," *NLRB* v. *Drivers Local Union No. 639,* 362 U. S. 274, 282–283 (1960), the admonition against regulation of the choice of economic weapons that may be used as part of collective bargaining absent a particularized statutory mandate is particularly apt in this context. *NLRB* v. *Insurance Agents,* 361 U. S. 477, 490 (1960). See Summers, Disciplinary Powers of Unions, 3 Ind. & Lab. Rel. Rev. 483 (1950); Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049 (1951); Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327 (1958); Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819 (1960).

rank-and-file work during an economic strike will deprive the employer of the full loyalty of those supervisors. Indeed, it is precisely that concern that is reflected in these and other recent decisions of the Board holding that the statutory language "restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances" is not confined to situations in which the union's object is to force a change in the identity of the employer's representatives, but may properly be read to encompass any situation in which the union's actions are likely to deprive the employer of the undivided loyalty of his supervisory employees. As the Board stated in *Wisconsin Electric:*

> "During the strike of the Union, the Employer clearly considered its supervisors among those it could depend on during this period. The Union's fining of the supervisors who were acting in the Employer's interest in performing the struck work severely jeopardized the relationship between the Employer and its supervisors. Thus, the fines, if found to be lawful, would now permit the Union to drive a wedge between a supervisor and the Employer, thus interfering with the performance of the duties the Employer had a right to expect the supervisor to perform. The Employer could no longer count on the complete and undivided loyalty of those it had selected to act as its collective-bargaining agents or to act for it in adjusting grievances. Moreover, such fines clearly interfere with the Employer's control over its own representatives.
>
> "The purpose of Section 8 (b) (1) (B) is to assure to the employer that its selected collective-bargaining representatives will be completely faithful to its desires. This cannot be achieved if the union has an

effective method, union disciplinary action, by which it can pressure such representatives to deviate from the interests of the employer." 192 N. L. R. B., at 78.

The Board in the present cases echoes this view in arguing that "where a supervisor is disciplined by the union for performing other supervisory or management functions, the likely effect of such discipline is to make him subservient to the union's wishes when he performs those functions in the future. Thus, even if the effect of this discipline did not carry over to the performance of the supervisor's grievance adjustment or collective bargaining functions, the result would be to deprive the employer of the full allegiance of, and control over, a representative he has selected for grievance adjustment or collective bargaining purposes." Brief for Petitioner in No. 73–795, p. 34.

The concern expressed in this argument is a very real one, but the problem is one that Congress addressed, not through § 8(b)(1)(B), but through a completely different legislative route. Specifically, Congress in 1947 amended the definition of "employee" in § 2 (3), 29 U. S. C. § 152 (3), to exclude those denominated supervisors under § 2 (11), 29 U. S. C. § 152 (11), thereby excluding them from the coverage of the Act.[17] See

---

[17] Title 29 U. S. C. § 152 (3) provides in pertinent part:

"The term 'employee' shall include any employee, . . . but shall not include . . . any individual employed as a supervisor . . . ."

Title 29 U. S. C. § 152 (11) provides:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

*NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267 (1974). Further, Congress enacted § 14 (a), 29 U. S. C. § 164 (a), explicitly providing:

"Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

Thus, while supervisors are permitted to become union members, Congress sought to assure the employer of the loyalty of his supervisors by reserving in him the right to refuse to hire union members as supervisors, see *Carpenters District Council* v. *NLRB,* 107 U. S. App. D. C. 55, 274 F. 2d 564 (1959); *A. H. Bull S. S. Co.* v. *National Marine Engineers' Beneficial Assn.,* 250 F. 2d 332 (CA2 1957), the right to discharge such supervisors because of their involvement in union activities or union membership, see *Beasley* v. *Food Fair of North Carolina, Inc.,* 416 U. S. 653 (1974); see also *Oil City Brass Works* v. *NLRB,* 357 F. 2d 466 (CA5 1966); *NLRB* v. *Fullerton Publishing Co.,* 283 F. 2d 545 (CA9 1960); *NLRB* v. *Griggs Equipment, Inc.,* 307 F. 2d 275 (CA5 1962); *NLRB* v. *Edward G. Budd Mfg. Co.,* 169 F. 2d 571 (CA6 1948), cert. denied, 335 U. S. 908 (1949),[18] and the right to refuse to engage in collective bargaining with them, see *L. A. Young Spring & Wire Corp.* v. *NLRB,* 82

---

[18] It has been held that this right is limited to the extent that an employer cannot discharge supervisory personnel for participation in the union where the discharge is found to interfere with, restrain, or coerce employees in the exercise of their protected rights, see *NLRB* v. *Talladega Cotton Factory, Inc.,* 213 F. 2d 209 (CA5 1954), or where it is prompted by the supervisors' refusal to engage in unlawful activity, see *NLRB* v. *Lowe,* 406 F. 2d 1033 (CA6 1969).

U. S. App. D. C. 327, 163 F. 2d 905 (1947), cert. denied, 333 U. S. 837 (1948).

The legislative history of §§ 2 (3) and 14 (a) of the Act clearly indicates that those provisions were enacted in response to the decision in *Packard Motor Car Co.* v. *NLRB,* 330 U. S. 485 (1947), in which this Court upheld the Board's finding that the statutory definition of "employee" included foremen, and that they were therefore entitled to the coverage of the Act in the absence of a decision by Congress to exclude them.[19] In recommending passage of this legislation, the Senate Report noted:

> "*It is natural to expect that unless this Congress*

[19] Prior to the passage of the National Labor Relations Act in 1935, foremen and rank-and-file workers were often members of the same bargaining unit, and such conflict-of-interest problems as arose were dealt with through the collective-bargaining process. After first holding that supervisors could organize in independent or affiliated unions in *Union Collieries Coal Co.,* 41 N. L. R. B. 961 (1942) and *Godchaux Sugars, Inc.,* 44 N. L. R. B. 874 (1942), the Board, concerned by the conflict of interests created thereby, reversed its position in *Maryland Drydock Co.,* 49 N. L. R. B. 733 (1943), and held that except where foremen had been organized in 1935 when the Act was passed, supervisory units were not appropriate collective-bargaining units under the Wagner Act. The Board then reversed its position again in *Packard Motor Car Co.,* 61 N. L. R. B. 4, enforced, 157 F. 2d 80 (CA6), aff'd, 330 U. S. 485 (1947), holding that supervisory employees as a class were entitled to the rights of self-organization and collective bargaining. See *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 277 (1974); *Beasley* v. *Food Fair of North Carolina, Inc.,* 416 U. S., at 658 n. 4. See also House Report 13–14. In discussing the proposed legislation dealing with supervisory personnel, the Senate Report stated:

"It should be noted that all that the bill does is to leave foremen in the same position in which they were until the Labor Board reversed the position it had originally taken in 1943 in the *Maryland Drydock case* (49 N. L. R. B. 733). In other words, the bill does not prevent anyone from organizing nor does it prohibit any em-

*takes action, management will be deprived of the undivided loyalty of its foremen.* There is an inherent tendency to subordinate their interests wherever they conflict with those of the rank and file." Senate Report 5. (Emphasis supplied.)

A similar concern with this conflict-of-loyalties problem was reflected in the House Report:

"The evidence before the committee shows clearly that unionizing supervisors under the Labor Act is inconsistent with . . . our policy to protect the rights of employers; *they, as well as workers, are entitled to loyal representatives in the plants,* but when the foremen unionize, even in a union that claims to be 'independent' of the union of the rank and file, they are subject to influence and control by the rank and file union, and, instead of their bossing the rank and file, the rank and file bosses them.

.    .    .    .    .

"The bill does not forbid anyone to organize. It does not forbid any employer to recognize a union of foremen. Employers who, in the past, have bargained collectively with supervisors may continue to do so. What the bill does is to say what the law always has said until the Labor Board, in the exercise of what it modestly calls its 'expertness', changed the law: *That no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for any rea-*

---

ployer from recognizing a union of foremen. It merely relieves employers who are subject to the national act free from any compulsion by this National Board or any local agency to accord to the front line of management the anomalous status of employees." Senate Report 5.

*son, he does not trust."* House Report 14–17.[20] (Emphasis supplied.)

It is clear that the conflict-of-loyalties problem that the Board has sought to reach under § 8 (b)(1)(B) was intended by Congress to be dealt with in a very different manner.[21] As we concluded in *Beasley* v. *Food Fair of North Carolina, Inc.,* 416 U. S., at 661–662:

"This history compels the conclusion that Congress' dominant purpose in amending §§ 2 (3) and 2 (11), and enacting § 14 (a) was to redress a perceived imbalance in labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposed interests."

While we recognize that the legislative accommodation adopted in 1947 is fraught with difficulties of its own, "[i]t is not necessary for us to justify the policy of Congress. It is enough that we find it in the statute." *Col-*

---

[20] Instructive as well is the fact that §§ 2 (3) and 14 (a) were both slightly modified versions of §§ 9 (a) and (c) of the Case bill, H. R. 4908, 79th Cong., 2d Sess. (1946), which was passed by Congress in 1946 but vetoed by President Truman. See Senate Report 5. That earlier bill, however, contained no provision bearing any resemblance to § 8 (b)(1)(B), which first appeared in S. 1126, 80th Cong., 1st Sess. (1947).

[21] Further support for the proposition that § 8 (b)(1)(B) was addressed to a separate and far more limited problem than that of conflict of loyalties dealt with in §§ 2 (3), 2 (11), and 14 (a) is found in the differing scope of the provisions themselves. Section 8 (b)(1)(B) purports to cover only those selected as the employer's representative "for the purposes of collective bargaining or the adjustment of grievances," whereas the class of supervisors excluded from the definition of employees in § 2 (3) is defined by § 2 (11) to include individuals engaged in a substantially broader range of activities. See *supra,* n. 17; *NLRB* v. *Bell Aerospace Co., supra.* The two groups coincide only with respect to the function of grievance adjustment.

*gate-Palmolive Peet Co. v. NLRB,* 338 U. S. 355, 363 (1949).[22]

Congress' solution was essentially one of providing the employer with an option. On the one hand, he is at liberty to demand absolute loyalty from his supervisory personnel by insisting, on pain of discharge, that they neither participate in, nor retain membership in, a labor union, see *Beasley* v. *Food Fair of North Carolina, Inc.,*

---

[22] There can be no denying that the supervisors involved in the present cases found themselves in something of a dilemma, and were pulled by conflicting loyalties. But inherent in the option afforded the employer by Congress, must be the recognition that supervisors permitted by their employers to maintain union membership will necessarily incur obligations to the union. See *Nassau & Suffolk Contractors' Assn., Inc.,* 118 N. L. R. B. 174, 182 (1957). See Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049 (1951). And, while both the employer and the union may have conflicting but nonetheless legitimate expectations of loyalty from supervisor-members during a strike, the fact that the supervisor will in some measure be the beneficiary of any advantages secured by the union through the strike makes it inherently inequitable that he be allowed to function as a strikebreaker without incurring union sanctions.

The supervisor-member is, of course, not bound to retain his union membership absent a union security clause, and if, for whatever reason, he chooses to resign from the union, thereby relinquishing his union benefits, he could no longer be disciplined by the union for working during a strike. *NLRB* v. *Textile Workers,* 409 U. S. 213 (1972); *Booster Lodge 405* v. *NLRB,* 412 U. S. 84 (1973).

In these cases, the supervisors' dilemma has been somewhat exaggerated by the petitioners. In *Illinois Bell,* the company did not command its supervisors to work during the strike and expressly left the decision to each individual. Those who chose not to work were not penalized, and some were in fact promoted by their employer after the strike had ended. Those who did work during the strike but performed only their regular duties were not disciplined by the union. In *Florida Power,* the record does not disclose whether the supervisors crossed the picket lines at the company's request or not, but in any event, the union did not discipline those who did so only to perform their normal supervisory functions.

*supra.* Alternatively, an employer who wishes to do so can permit his supervisors to join or retain their membership in labor unions, resolving such conflicts as arise through the traditional procedures of collective bargaining.[23] But it is quite apparent, given the statutory language and the particular concerns that the legislative history shows were what motivated Congress to enact § 8(b) (1)(B), that it did not intend to make *that* provision any part of the solution to the generalized problem of supervisor-member conflict of loyalties.

For these reasons, we hold that the respondent unions did not violate § 8 (b)(1)(B) of the Act when they disciplined their supervisor-members for performing rank-and-file struck work. Accordingly, the judgment is

*Affirmed.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

Believing that the majority has improperly substituted its judgment for a fair and reasonable interpretation by

---

[23] Thus, while a union violates § 8 (b)(1)(B) by striking to force an employer to agree to hire only union members as foremen, *International Typographical Union Local 38* v. *NLRB,* 278 F. 2d 6 (CA1 1960), aff'd by an equally divided Court, 365 U. S. 705 (1961), see n. 7, *supra,* it can propose that supervisors be covered by the collective-bargaining agreement, *Sakrete of Northern California, Inc.* v. *NLRB,* 332 F. 2d 902 (CA9 1964), cert. denied, 379 U. S. 961 (1965). Similarly, it is clear that an employer may request that supervisors be excluded from the bargaining unit, *Federal Compress & Warehouse Co.* v. *NLRB,* 398 F. 2d 631 (CA6 1968); *NLRB* v. *Corral Sportswear Co.,* 383 F. 2d 961 (CA10 1967).

The parties in *Florida Power* in fact agreed to the inclusion in the collective-bargaining agreement of provisions governing the disciplining by the union of supervisory personnel, basically providing that such matters were to be dealt with through the grievance adjustment and arbitration provisions of the agreement. See *supra,* at 796.

the Board of § 8 (b)(1)(B) in light of the statutory language and legislative history of that provision and other provisions dealing with supervisors, I must dissent substantially for the reasons expressed by the dissent below.

While it might be unreasonable for the Board to interpret § 8 (b)(1)(B) to permit an employer to require absolute loyalty from a supervisor-member in all circumstances, it is certainly apparent that during an economic strike, the supervisor's performance of rank-and-file struck work, which represents a classic "use of economic pressure by the parties to a labor dispute . . . [,] is part and parcel of the process of collective bargaining." *NLRB* v. *Insurance Agents' International Union*, 361 U. S. 477, 495 (1960).[1] "As management representatives, supervisory personnel may be requested by management to enhance the bargaining position of their employer during a dispute between it and the particular union involved." 159 U. S. App. D. C. 272, 304, 487 F. 2d 1143, 1175 (1973) (en banc) (dissenting opinion) (footnote omitted). Moreover, these union sanctions would unavoidably decrease a supervisor's loyalty to his employer and thereby materially interfere with the performance of those responsibilities which the employer quite properly demands of him. *Local Union No. 2150, IBEW* (*Wisconsin Electric Power Co.*), 192 N. L. R. B. 77, 78 (1971), enforced, 486 F. 2d 602 (CA7 1973). Nothing in

---

[1] The court below acknowledged the practical realities of the use of supervisors during a strike: "in the highly automated public utility industries involved in these cases a small work force composed of strikebreakers and non-union management personnel can evidently provide sufficient manpower to continue vital services in a strike, thereby cutting into the strike's effectiveness." 159 U. S. App. D. C. 272, 290 n. 21, 487 F. 2d 1143, 1161 n. 21 (1973) (en banc).

the language or legislative history of the statute contradicts the conclusion that

> "[w]hen a union disciplines a supervisor for crossing a picket line to perform rank-and-file work at the request of his employer, that discipline *equally* interferes with the employer's control over his representative and *equally* deprives him of the undivided loyalty of that supervisor as in the case where the discipline was imposed because of the way the supervisor interpreted the collective bargaining agreement or performed his 'normal' supervisory duties." 159 U. S. App. D. C., at 305, 487 F. 2d, at 1176 (dissenting opinion).[2]

In a steady progression of decisions leading up to the instant cases, the Board concluded that § 8 (b)(1)(B) interdicted not only direct union pressure on an employer to replace a supervisor with collective-bargaining or grievance-adjustment functions, but also indirect coercion of an employer by means of attempting, through the application of union discipline apparatus against supervisor-members, to dictate the manner in which they would exercise their supervisory responsibilities. Far from seeing the present cases as a radical extension of this principle, I view the Board's decisions as a reasoned and realistic application of § 8 (b)(1)(B). For my part, the Board's findings are based upon substantial record evidence and enjoy "a reasonable basis in law." *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 131 (1944). It may be true that special concerns prompted § 8 (b)(1)(B), but the provision, as is often the case, was written

---

[2] I do not read the Court to say that § 8 (b)(1)(B) would allow a union to discipline supervisor-members for performing supervisory or management functions, as opposed to customary rank-and-file work, during a labor dispute.

more broadly. Nor do I see anything in the legislative history foreclosing the Board from applying the section to prevent unions from imposing sanctions on supervisors in the circumstances present here. This Court is not a super-Board authorized to overrule an agency's choice between reasonable constructions of the controlling statute. We should not impose our views on the Board as long as it stays within the outer boundaries of the statute it is charged with administering. Respectfully, I dissent.