**NORTHWEST PUBLICATIONS, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–7459.

United States Court of Appeals, Ninth Circuit.

Sept. 14, 1981.

Arthur Mendelson, Littler, Mendelson, Fastiff & Tichey, San Francisco, Cal., for petitioner.

Andrew F. Tranovich, Washington, D. C., for respondent.

---

Before MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals, WALLACE and SCHROEDER, Circuit Judges.

MARKEY, Chief Judge.

Northwest Publications, Inc. (Northwest) petitions for review of an order of the National Labor Relations Board (NLRB). We *vacate* the order and *remand* to the NLRB.

### Background

Northwest publishes two daily newspapers, *The San Jose Mercury* and *The San Jose News*. Robert O'Donnell, foreman of the newsprint warehouse since February 1978, is a member of Teamsters Local 296, Sales Delivery Drivers, Warehousemen and Helpers Union (Union). O'Donnell receives a ten percent pay premium for his duties as foreman. In addition to regular work duties, O'Donnell's position as supervisor requires him to hire employees, set work schedules, determine if part-time help is needed, and assign overtime. O'Donnell also has responsibility for inventory, paper work associated with the newsprint warehouse, and determining work priorities in the warehouse.

Beginning in February, 1978, O'Donnell normally arrived at the warehouse thirty to forty-five minutes before the shift officially began. He unlocked the warehouse doors, walked through the warehouse and performed certain preliminary "prestart activities" so that work could begin smoothly when the shift started at 7 a. m. Those activities included one or all of the following: (1) starting a forklift to warm it up prior to the start of work, (2) if there was a truck at the loading dock, he would remove the first two rolls of newsprint and lower a dock plate into the truck, forming a bridge between the truck and the warehouse, (3) turning on the warehouse conveyor to move any newsprint rolls on it to the end of the warehouse. After performing those tasks, O'Donnell would punch in on the time clock. It is undisputed that Northwest did not pay O'Donnell "overtime" for his prestart activities.

O'Donnell received a letter from Union dated April 12, 1979, starting that he had been observed working "off the clock", before stating time, on a number of occasions. Union, asserting that O'Donnell's actions constituted a violation of Union rules and sections 15 and 16 of the collective bargaining agreement between Union and Northwest, notified him to appear for a hearing.

On April 18, 1979, Northwest's Vice President for Employee Relations sent a letter to Union, pointing out that O'Donnell is a foreman, that the off clock work he does is necessary to assure efficient operation of the warehouse, and thus that that work is part of O'Donnell's duties as supervisor.

Acting on the advice of Northwest, O'Donnell did not appear at the hearing. He received a letter telling him he had been fined $250 for his actions, and that $150 of the fine had been suspended, leaving a fine owing of $100. The letter further stated that if he continued to work off the clock the suspended $150 fine would be reinstated. O'Donnell paid the $100 fine under protest.

On May 4, 1979, Northwest filed an unfair labor practice charge against Union, alleging violations of sections 8(b)(1)(B) of the National Labor Relations Act (Act). 29 U.S.C. § 158(b)(1)(B).

The NLRB administrative law judge concluded that Union fined O'Donnell solely for performing bargaining unit work off the clock and that there was no evidence that the discipline of O'Donnell involved a dispute between Northwest and Union over the meaning of a contractual provision.

A three-member panel of the NLRB affirmed by vote of 2–1. Northwest petitioned this court for review.

### ISSUE

The issue presented is whether the NLRB correctly found proper the fining of O'Donnell.

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

## OPINION

Section 8(b)(1)(B) of the Act makes it an unlawful labor practice for a labor organization or its agents "to restrain or coerce an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances. 29 U.S.C. § 158(b)(1)(B).[1] The circumstance in the industry here involved, in which supervisors are also union members, creates a special problem in relation to union discipline.

In *Florida Power and Light Company v. International Brotherhood of Electrical Workers, AFL–CIO, et al.*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974) (hereinafter *Florida Power*), the Supreme Court set forth the standard for determining when union discipline violates the statute. Enroute to its holding that the union did not violate Section 8(b)(1)(B) of the Act by disciplining a supervisor for performing bargaining unit work during a strike, the Court stated:

> The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of 8(b)(1)(B) only where that discipline may adversely affect the supervisor's conduct in performing the duties of and acting in his capacity as grievance adjustor or collective bargainer on behalf of the employer.

*Id.* at 805, 94 S.Ct. at 2745. As the Court noted in *Florida Power* the interpretation of activity that would adversely affect the supervisor's conduct as a grievance adjustor or collective bargainer has significantly expanded since the enactment of the Act in 1947.

For more than 20 years the Board applied Section 8(b)(1)(B) only to cases squarely within the metes and bounds of the statutory language.[2] In 1968, however, the Board extended the reach of that section with its decision in *San Francisco-Oakland Mailers Union No. 18 (Northwest Publications, Inc.)*, 172 N.L.R.B. 2173 (hereinafter *Oakland Mailers*). In that case, involving the same employer as here, three foremen-members were expelled from the union for allegedly assigning bargaining unit work in violation of the collective-bargaining agreement. Despite the absence of union pressure or coercion aimed at securing the replacement of the foremen, the Board held that the union had violated section 8(b)(1)(B) by seeking to influence the manner in which the foreman interpreted the contract.

In "assum[ing] without deciding that the Board's *Oakland Mailers* decision fell within the outer limits of [the] test"[3] being set forth in *Florida Power*, the Supreme Court observed:

> In *Oakland Mailers* the union had disciplined its supervisor members for an alleged misinterpretation or misapplication of the collective-bargaining agreement,

1. It is undisputed that O'Donnell is a supervisor. Neither the administrative law judge nor the Board reached the question of whether O'Donnell was a "representative" within the purview of § 8(b)(1)(B), though the former indicated that he would not so hold if the question were reached. The Board's brief candidly refers to the administrative law judge's express recognition that Board guidance was lacking, citing conflicting authorities. Northwest's brief cites authorities, including *Wisconsin River, infra*, note 7, indicating that a supervisor having O'Donnell's duties is within § 8(b)(1)(B). Whether a supervisor is currently a representative may not be material, if a union's disciplinary action be such as to chill a supervisor's willingness to undertake representative responsibilities, and thus restrain an employer in selecting his representatives. Because § 8(b)(1)(B) would not be implicated at all if O'Donnell were neither a representative nor one against whom disciplinary action would restrain Northwest's selection of representatives, it must be presumed that the Board assumed one or the other fact as true. Like the Board, however, we refrain from deciding the question, taking the case as it is presented and without prejudice to the Board's consideration of the question should it so elect on remand.

2. *See, e. g., International Typographical Union and Baltimore Typographical Union No. 12 (Graphic Arts League)*, 87 N.L.R.B. 1215 (1949); *Los Angeles Cloak Joint Board ILGWU (Helen Rose Co.)*, 127 N.L.R.B. 1543 (1960).

3. *Florida Power*, 417 U.S. at 805, 94 S.Ct. at 2745; *see also, American Broadcasting Companies v. Writers Guild*, 437 U.S. 411, 436, 98 S.Ct. 2423, 2437, 57 L.Ed.2d 313 (1978).

and the Board had reasoned that the natural and foreseeable effect of such discipline was that in interpreting the agreement in the future, the supervisor would be reluctant to take a position adverse to that of the union. *Florida Power,* 417 U.S. at 801, 94 S.Ct. at 2743.

In *American Broadcasting Companies v. Writers Guild, supra,* note 3, the court again recognized that union discipline may have a "carryover" effect which would adversely affect the supervisor's conduct, depriving the employer of the full services of his representative and thereby restraining and coercing the employer in his selection of representatives. *Id.* at 429, 98 S.Ct. at 2434.

The inquiry into whether union conduct would or might adversely affect the duties of an employer's representative is "necessarily a matter of probabilities, and its resolution depends much on what experience would suggest are the justifiable inferences from the known facts. This seems ... to be peculiarly the kind of determination that Congress has assigned to the Board...." *Id.* at 432, 98 S.Ct. at 2435.

■ An order of the Board will be enforced by this court if there is substantial evidence in the record supporting it. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *N.L.R.B. v. Best Products Co., Inc.,* 618 F.2d 70 (9th Cir. 1980). Fear of an accusation that it is substituting its judgment for that of the Board should not, however, so enervate a court as to substitute judicial abdication for judicial review. *N.L.R.B. v. Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 630 F.2d 505, 507 (7th Cir. 1980).

■ There is no factual dispute between the parties concerning O'Donnell's specific prestart activities. The question before this court is therefore whether the Board applied the correct legal analysis to the facts of record.

In its decisions subsequent to *Florida Power* the Board has clarified the circumstances under which union discipline has a carry-over effect that impairs the supervisor's 8(b)(1)(B) functions. In *Teamsters Local No. 524, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Yakima County Beverage Company),* 212 N.L.R.B. 908 (1974) (hereinafter *Yakima* ), the union filed charges against three supervisors for performing bargaining unit work off the clock at the request of a customer. The union charged that the supervisor-members violated the union's bylaws and constitution by breaching a provision of the applicable collective-bargaining agreement because they performed work after regular working hours without prior union consent. The union therein acknowledged that its discipline of the supervisors was directed at the employer's interpretation of the contract, not primarily at the three men as union members. The union fines therefore served to impose upon the company the union's interpretation of the collective-bargaining agreement without initiating a grievance procedure. The Board has similarly found violations of Section 8(b)(1)(B) in numerous other cases where the union fine was in fact founded upon a disputed contract provision.[4]

---

4. *See,* for example, *Construction, Production and Maintenance Laborers' Union, Local No. 383, AFL–CIO (Chanen Construction Co.),* 221 N.L.R.B. 1283, 1288 (1975) (the supervisor "was deciding the work jurisdiction issues relating to the size and composition of work crews in furtherance of his employer's interests, and consistent with his interpretation of the jurisdictional requirements of the collective-bargaining agreement"); *Local 423, Laborers' Int. Union of North America, AFL–CIO*

*(Mansfield Flooring),* 195 N.L.R.B. 241, at 241 (1972), *enf'd,* 82 LRRM 2478 (D.C.Cir.1973) (per curiam) (dispute between the parties over whether a foreman can perform manual work on the jobsite); *Freight, Construction, General Drivers, Warehousemen and Helpers Union, Local 287, IBT (Grinnell Co.),* 183 N.L.R.B. 398, 402 (1970) (dispute between the parties over the type of work to be performed by an employee working within a certain job description); *Sheet Metal Workers' Unt. Assn. Local*

In an attempt to distinguish *Yakima* and its progeny, the Board first says Union's fining of O'Donnell did not involve the interpretation or application of the collective-bargaining agreement. That assertion falls victim to the undisputed record.

In Union's initial letter to O'Donnell, citing him to appear before its executive Board, O'Donnell was charged with, "violation of Sections 15 and 16 of the contract and the working rules of this Local Union." [5] Sections 15 and 16 of the collective-bargaining agreement relate to the hours of work and wage rates therefor. More specifically, section 15 states that overtime shall be paid for all time worked in excess of 8 hours per day and 40 hours per week. Union's post-hoc efforts to portray the charge as solely a union matter, not involving the employer or the agreement in any way, cannot replace Union's own assertion to the contrary.

Similarly, it will not do to rest decision on the view that there was no employer-union dispute extant when Union's disciplinary action was taken. A major purpose of the National Labor Relations Act, and of the practices evolved under it, is to provide for an organized, and to the maximum feasible extent peaceful, mechanism for resolving such disputes. For a union to by-pass that mechanism, raising no contract interpretation dispute with the employer but proceeding directly to disciplinary action, would defeat that purpose of the Act. Hence, the question is not whether there was an employer-union dispute but whether there should have been. The focus is not on the existence of a dispute but on whether the subject matter involved in the disciplinary action is such as to require its submission to the agreed dispute-resolving mechanism.

Northwest posits that all of O'Donnell's prestart activities are supervisory duties customarily undertaken by his predecessors, "off the clock", without protest by the Union. It is undisputed that O'Donnell's activities are intended to facilitate the actual start of work at the scheduled hour. That action is asserted to be consistent with O'Donnell's supervisory responsibility for the efficient scheduling of work in the warehouse.

The Board says O'Donnell's prestart activities do not constitute a supervisory function, a view inconsistent with *Yakima*, in which the Board found that the supervisors conduct was "arguably for exercising supervisory or management functions" [6] when they performed bargaining unit work after hours. Thus the Board there recognized that proper classification of the work should be based upon an *overall* analysis of the activity engaged in by the supervisor during the period for which the discipline is imposed.

Likewise, in other post-*Florida Power* decisions the Board found a violation of section 8(b)(1)(B) where the work performed was at least in part bargaining unit work.[7]

Of O'Donnell's numerous prestart activities, Union complains only of his removal of print rolls from the truck, for which O'Donnell should have been paid overtime under section 15 of the collective bargaining agreement. In selecting for disciplinary action a portion of O'Donnell's activity, Union reserved for itself the right to unilaterally decide what acts are covered under the collective-bargaining agreement and what acts are supervisory. Such a decision

---

*Union 49*, 178 N.L.R.B. 139, 141 (1969), enf'd, 430 F.2d 1348 (10th Cir. 1970) (dispute between the parties over whether certain work should be assigned to sheet metal workers instead of to carpenters and laborers).

5. The original Union charge form asserted only the violation of Sections 15 and 16 of the contract.

6. *Yakima*, 212 N.L.R.B. at 910, n. 6.

7. *Chicago Typographical Union No. 16 (Hammond Publishers, Inc.)*, 216 N.L.R.B. 903 (1975), enf'd, 539 F.2d 242 (D.C.Cir.1976); *Bakery, Cracker, Pie, Yeast Drivers and Miscellaneous Workers Union, Local 734, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (ITT Continental, River Grove)*, 238 N.L.R.B. 189 (1978); see also, *Wisconsin River Valley District Council of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO v. N.L.R.B.*, 532 F.2d 47 (7th Cir. 1976).

avoids established grievance procedures and could affect the manner in which O'Donnell might fulfill a grievance adjustor or collective bargainer function. *American Broadcasting Companies, Inc. v. Writers Guild of America, supra,* note 3.

### CONCLUSION

The Board's failure to follow its own precedents requires that its order dismissing the complaint be vacated. *See, Midwest Stock Exchange v. N.L.R.B.,* 620 F.2d 629 (7th Cir. 1980), *cert. denied,* 449 U.S. 873, 101 S.Ct. 214, 66 L.Ed.2d 94 (1980).[8] The case is accordingly remanded to the Board for further proceedings consistent with this opinion.

VACATED AND REMANDED.

---

8. The parties here have not asked this Court to consider the correctness of the Board's reasoning or conclusion in *Yakima* in light of 29 U.S.C. § 158(b)(1)(B) and the Supreme Court's decision in *Florida Light and Power.* We express no view, therefore, on that question.

