NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
UNION NO. 323, Respondent.

No. 81–6108.

United States Court of Appeals,
Eleventh Circuit.

April 18, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, Elaine Patrick, N.L.R.B., Washington, D.C., for petitioner.

Joseph H. Kaplan, Kaplan, Sicking, Hessen, Sugarman, Rosenthal & Zientz, P.A., Joseph C. Segor, Miami, Fla., for respondent.

Before HENDERSON and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

The National Labor Relations Board (Board) petitions this court to enforce an

order directed against the respondent, Local Union 323 of the International Brotherhood of Electrical Workers (Union), for an alleged unfair labor practice in violation of § 8(b)(1)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(B). We enforce the order.

The facts are essentially undisputed. In 1970, John Willey, a longtime member of the International Brotherhood of Electrical Workers (IBEW), moved to Palm Beach County, Florida. He obtained a work permit from the local IBEW chapter, Local 323, and secured an electrician's job through the Union's hiring hall. He retained his official membership with his former local chapter of the IBEW in Terre Haute, Indiana.

In 1974, Willey passed the county's master electrician examination and received a certificate of competency. This authorization enabled him either to operate as a contractor or to apply for the required electrical permits on behalf of other contractors. Soon after acquiring master electrician status, Willey and a partner formed their own electrical contracting business. At that time, he allowed his working permit with the local Union to expire, although he continued to pay membership dues.

The following year, Willey sold his business and accepted a position as the electrical superintendent for Drexel Properties, Inc. (Drexel). Drexel is engaged in land development and residential and warehouse construction. The company is a nonunion employer and has no contract with Local 323. In his capacity as superintendent, Willey supervises all of the electrical contracts performed in the company's construction projects. His responsibilities include the hiring and firing of electricians, handling employee complaints concerning working conditions and equipment safety, imposing disciplinary sanctions, making work assignments, and approving vacation requests. Additionally, he utilizes his master's certificate to obtain county permits on behalf of Drexel. By law, he is required to accept supervisory responsibility for all electrical work performed pursuant to those permits. As compensation, Willey receives a salary; he does not share in Drexel's profits nor does he hold any ownership interest in the company.

In 1977, the business manager of Local 323 preferred written charges against Willey, accusing him of "running a nonunion electrical contracting business." He charged that Willey had violated the IBEW Constitution.[1] During the ensuing trial, Willey and the Union officials discussed the fact that he secured electrical work permits for Drexel through the use of his master's certificate. The trial board informed him that this practice violated the working agreement between Local 323 and area union employers.[2] One member advised Willey to quit his job and leave the area.[3]

---

1. The constitutional provisions cited in the charge were Article XXVII, § 1, subsections 10 and 21:

ARTICLE XXVII
MISCONDUCT, OFFENSES AND PENALTIES
sec. 1. Any member may be penalized for committing any one or more of the following offenses:

(10) Working in the interest of any organization or cause which is detrimental to, or opposed to, the I.B.E.W.

(21) Working for any individual or company declared in difficulty with a L.U. or the I.B.E.W., in accordance with this Constitution.

2. The pertinent provision of the area working agreement reads,

ARTICLE II
EMPLOYER RIGHTS—UNION RIGHTS
Section 2.01. No member of the International Brotherhood of Electrical Workers, or other employees, subject to employment by employers operating under this agreement, shall himself become an employer for the performance of any electrical work. Any member, or other employee, possessing a masters license while employed under the terms of this agreement, shall maintain same on an inactive status. Any employer working under this agreement shall not take out a permit or master a job for any other person or firm, except in the case of a true joint venture.

3. During the subsequent hearing before an Administrative Law Judge (ALJ), the officer denied having ever made that remark. The ALJ, however, credited Willey's account of the conversation. We may not disturb a finding based

Soon afterward, Willey was found guilty of violating the two constitutional provisions and was fined $1,000.00 for each infraction. In a letter to Willey, the tribunal agreed to suspend part of the fine if he would "get right with the Local Union within 30 days and commit no further violations for a period of one year."

Willey then appealed to an International Vice President of the Union. That official affirmed the trial board's decision and noted that Willey had not contested the fact that he was "employed by a firm who does not have an agreement with Local 323." He also pledged to reduce the fines, contingent upon Willey's "immediate cessation of the violation." Subsequently, Willey continued to pursue his appeal in correspondence to various IBEW officers.

Before the Union ever informed Willey that he had exhausted his appeals, another member of Local 323 filed new accusations against him citing the same two constitutional provisions as the earlier charge, and also claiming a violation of the area working agreement. Willey was adjudged guilty of all three violations and fined an additional $5,150.00. The union offered to suspend the second set of fines if Willey would pay the fine outstanding on the first charge. Insisting that he was still appealing the original decision and that he intended to appeal the second set of charges, he refused. Consequently, the trial board expelled Willey from membership in the IBEW.

As a result of these actions, the Union was charged with an unfair labor practice, i.e., a violation of § 8(b)(1)(B), which proscribes the restraint or coercion of an employer in the selection of his representative for the purposes of collective bargaining or the adjustment of grievances. After a hearing, the Administrative Law Judge (ALJ) found that the 1977 fines were imposed for "working for a nonunion contractor." The ALJ also concluded that the second set of violations concerned his associ-

ation with a nonunion employer and his use of his master's certificate for the benefit of Drexel. In his view, these sanctions constituted unlawful coercion under § 8(b)(1)(B). The ALJ rejected the Union's contention that the statute did not apply to its conduct because Willey was an employer. Based on these findings, the ALJ recommended a cease and desist order enjoining further violations, as well as various types of affirmative relief.

The Union filed exceptions to the ALJ's findings. On review, the National Labor Relations Board adopted all of the ALJ's pertinent findings and conclusions of law. The Board members unanimously agreed that the union acted in violation of § 8(b)(1)(B) by disciplining Willey for his employment with a nonunion firm. A majority of the Board also characterized the fine imposed for using the master's certificate as "part and parcel of the same violation." One member, however, expressed a contrary view. The Board now seeks to enforce its order.

Section 8(b) provides in pertinent part that "[i]t shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce ... (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." Since the 1968 decision in *San Francisco-Oakland Mailers' Union No. 18,* 172 NLRB 2173, the Board—with judicial acquiescence—has construed the statute to prohibit not only direct pressure on an employer, but also coercion aimed at the supervisor, which indirectly affects the employer's selection. *See American Broadcasting Cos. v. Writer's Guild of America, West, Inc.,* 437 U.S. 411, 429, 98 S.Ct. 2423, 2433–34, 57 L.Ed.2d 313, 328 (1978); *see generally Florida Power & Light Co. v. International Brotherhood of Electrical Workers,* 417 U.S. 790, 800–01, 94 S.Ct. 2737, 2742–43, 41 L.Ed.2d 477, 485–86 (1974). In spite of this expansive interpretation, the reach of § 8(b)(1)(B) is not with-

upon a credibility determination. *See NLRB v. Pope Maintenance Corp.,* 573 F.2d 898, 905 (5th Cir.1978).

out restriction. In two cases decided during this past decade, the Supreme Court examined the "outer limits" of the statute's application. *See, e.g., Florida Power & Light,* 417 U.S. at 805, 94 S.Ct. at 2745, 41 L.Ed.2d at 488. A closer look at the provision's "outer limits" will demonstrate that the Union's actions in this case fall within those parameters, thereby constituting prohibited conduct.

The Court in *Florida Power & Light* faced the issue whether punitive measures taken by a union against supervisory personnel for crossing picket lines to perform duties customarily undertaken by rank-and-file employees contravened § 8(b)(1)(B). Without repudiating the *San Francisco-Oakland Mailers'* doctrine, the Court refused to extend the statute to immunize a supervisor's performance of rank-and-file work. *Id.* at 805, 94 S.Ct. at 2745, 41 L.Ed.2d at 488. According to the Court, it was the purpose of Congress to protect an employer's "*selection* of its representatives for the purposes of collective bargaining and grievance adjustment." *Id.* at 804, 94 S.Ct. at 2744, 41 L.Ed.2d at 488 (emphasis in original). For that reason, the Court said,

> [t]he conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.

*Id.* at 804–05, 94 S.Ct. at 2744–45, 41 L.Ed.2d at 488. Finding that the union discipline did not affect the supervisors' performance of the pertinent duties, the Court held that the Union's conduct did not violate the statute. *Id.* at 805, 94 S.Ct. at 2745, 41 L.Ed.2d at 488.

In *American Broadcasting Cos.,* the Court had occasion to consider the implications of its holding in *Florida Power & Light.* The union involved in that case ordered its supervisory members not to cross picket lines, even to perform their supervisory duties. Some of the members obeyed the directive,

and the ones who did not were subsequently penalized by the union. In its evaluation of the legality of the union's actions, the Court reiterated the inquiry originally formulated in *Florida Power & Light.* Union discipline of a supervisor contravenes § 8(b)(1)(B) if that coercion "may adversely affect" his performance of grievance adjustment or collective bargaining responsibilities. *American Broadcasting Cos.,* 437 U.S. at 429, 98 S.Ct. at 2434, 57 L.Ed.2d at 328; *see Florida Power & Light,* 417 U.S. at 804–05, 94 S.Ct. at 2744–45, 41 L.Ed.2d at 488. Applying that test to the facts before it, the Court concluded that the requisite "adverse" effect was present. As for the supervisors kept from work by union pressure, the opinion stated that the "employer was restrained and coerced within the meaning of § 8(b)(1)(B) by being totally deprived of the opportunity to choose these particular supervisors as his collective-bargaining or grievance-adjustment representatives during the strike." *American Broadcasting Cos.,* 437 U.S. at 432, 98 S.Ct. at 2435, 57 L.Ed.2d at 329. Similarly, the Court agreed with the Board that the discipline imposed on those members who actually crossed the picket lines could influence the performance of their grievance-adjustment duties and therefore deprive the employer of "the full range of services from his supervisors." *Id.* at 434, 98 S.Ct. at 2436, 57 L.Ed.2d at 331. The Court reasoned that "[u]nion pressure on supervisors can affect either their willingness to serve as grievance adjustors or collective bargainers, or the manner in which they fulfill these functions; and either effect impermissibly coerces the employer in his choice of representative." *Id.* at 436, 98 S.Ct. at 2437, 57 L.Ed.2d at 332; *see also NLRB v. System Council T–6, International Brotherhood of Electrical Workers,* 599 F.2d 5, 9 (1st Cir.1979).

To illustrate, the Court cited with approval *New Mexico District Council of Carpenters and Joiners of America (A.S. Horner, Inc.),* 177 NLRB 500 (1969), *enforced,* 454 F.2d 1116 (10th Cir.1972), a decision particularly applicable to the case at hand. *See American Broadcasting Cos.,* 437 U.S. at 436 n. 36, 98 S.Ct. at 2437 n. 36, 57 L.Ed.2d

at 332 n. 36. In *A.S. Horner,* the Board found, as it did in this case, that union discipline of a member because he worked as a supervisor for a nonunion employer violated the statute. 177 NLRB at 503; *c.f. Wisconsin River Valley District Council v. NLRB (Skippy Enterprises, Inc.),* 532 F.2d 47 (1976) (statute prohibits union fining member-supervisor for disobeying a "no contract-no work" policy and working for employer who refuses to sign bargaining agreement). In discussing *A.S. Horner,* the Court relied upon the District of Columbia Circuit's analysis of that case in *International Brotherhood of Electrical Workers v. NLRB,* 487 F.2d 1143, 1154–55 n. 19 (D.C. Cir.1973) (*en banc*), aff'd sub nom., *Florida Power & Light Co. v. International Brotherhood of Electrical Workers,* 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). In that opinion, the court observed that *A.S. Horner* "falls close to the original rationale of § 8(b)(1)(B) which was to permit the employer to keep the bargaining representative of his own choosing." 487 F.2d at 1155 n. 19.

■ Against this background, the Union's disciplinary sanctions and eventual expulsion of Willey constitute unlawful coercion. The ALJ found, based on uncontroverted testimony, that Willey had extensive grievance adjustment responsibilities in his capacity as Drexel's electrical superintendent. As previously noted, Willey had numerous duties—such as handling complaints of conditions and safety at the work site—requiring settlement of the individual problems of the employees under his supervision. Because he was fined for his affiliation with a nonunion company, "compliance ... with the union's demands would have 'the effect of depriving the Company of the services of its selected representative for the purposes of collective bargaining or the adjustment of grievances.'" *American Broadcasting Cos.,* 437 U.S. at 436 n. 36, 98 S.Ct. at 2437 n. 36, 57 L.Ed.2d at 332 n. 36, *quoting, A.S. Horner,* 177 NLRB at 502.

Such a potential adverse effect on the employer's choice is determinative under the Supreme Court's test. *See, e.g., American Broadcasting Cos.,* 437 U.S. at 429, 98 S.Ct. at 2434, 57 L.Ed.2d at 328. Thus, the union's sanctions against Willey amounted to an unfair labor practice in violation of § 8(b)(1)(B).

Nevertheless, the Union advances several reasons why the prohibition should not apply to its actions in this case. First, it argues that, because it did not represent Drexel's employees, the sanctions against Willey were an internal union matter, and not an attempt to coerce his employer. As support for this position, it relies on *NLRB v. International Brotherhood of Electrical Workers, Local 73 (Chewelah Contractor's, Inc.),* 621 F.2d 1035 (9th Cir.1980).

In *Chewelah,* the court held that a union does not act contrary to § 8(b)(1)(B) if it neither represents nor displays a representational interest in the company's employees. 621 F.2d at 1037. The union in *Chewelah* had fined a member-supervisor for his employment with a nonunion company. The Board declared the discipline unlawful under § 8(b)(1)(B). On appeal, the Ninth Circuit refused to enforce the order. The court initially identified the two concerns it considered paramount in Congress' enactment of the statute: (1) preventing union pressure on employers regarding their participation in multiemployer bargaining units, and (2) guaranteeing a bargaining representative's complete loyalty to his employer.[4] *Id.* at 1036. While the court admitted that such considerations may be relevant when the union represents the company's employees, absent that nexus, the policies underlying the statute were not implicated. *Id.* at 1036–37.

The court further observed that in all the § 8(b)(1)(B) decisions it had reviewed, the union had been the bargaining representa-

4. We note, however, that the Supreme Court has rejected the notion that Congress intended § 8(b)(1)(B) to guarantee a supervisor's loyalty. *See Florida Power & Light,* 417 U.S. at 813, 94 S.Ct. at 2749, 41 L.Ed.2d at 492–93. Rather, other provisions in the Act address that concern. *Id.* at 807, 94 S.Ct. at 2746, 41 L.Ed.2d at 489.

tive of the company's employees.[5] *Id.* at 1037. Because it did not have such a representational interest, the union lacked any *"incentive* to either influence Chewelah's choice of bargaining representatives or affect [the supervisor's] loyalty to Chewelah." *Id.* (emphasis added). Finally, characterizing the discipline as an internal union affair, the court emphasized that the penalized member always retained the option of resigning from the union.[6] *Id.* For these reasons, the court announced that "[a] union does not violate Section 8(b)(1)(B) by disciplining a member, even though that member is also the bargaining representative of an employer, if the union neither represents nor shows an intent to represent the employer's employees." [7] *Id.*

■ In this case, the Union invites us to engraft the same limitation on our interpre-

tation of the statute.[8] We decline to do so. Our reading of the statute, and the two Supreme Court decisions construing it, does not support such a restrictive application. Most significantly, contrary to the *Chewelah* court's suggestion, a § 8(b)(1)(B) violation does not hinge on the union's incentive or intent in disciplining a supervisory member. Rather, the statute proscribes any union pressure which "may adversely affect" the supervisor's performance of the protected duties. *American Broadcasting Cos.,* 437 U.S. at 429, 98 S.Ct. at 2434, 57 L.Ed.2d at 328; *Florida Light & Power,* 417 U.S. at 804–05, 94 S.Ct. at 2744–45, 41 L.Ed.2d at 488. Hence, the provision prohibits any union conduct which has the effect of restraining the employer's choice, even if the union's motivation does not contemplate that result.[9]

5. The court did not mention *A.S. Horner,* or the Supreme Court's tacit approval of that case in *American Broadcasting Cos.* In *A.S. Horner,* the union had lost two representation elections and did not represent the company's employees at the time of the imposition of the sanctions. 454 F.2d at 1117; *cf. International Organization of Masters, Mates and Pilots, Marine Division v. NLRB,* 539 F.2d 554–556 (5th Cir.1976) *cert. denied,* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 87 (1977) (union prohibited from picketing employer who had entered collective bargaining agreement with rival union instead of hiring its members as supervisors).

6. On the contrary, the Supreme Court has suggested that the option of terminating one's union membership does not alleviate the unlawful coerciveness of a union's sanctions. *American Broadcasting Cos.,* 437 U.S. at 437, 98 S.Ct. at 2437–38, 57 L.Ed.2d at 332. Moreover, we are unconvinced that discipline imposed in those circumstances is aimed solely at a conflict between the union and its member. As the Board observed in *A.S. Horner,* "the basic dispute underlying the disciplinary action against [the supervisor] was not entirely an intra-union matter but stemmed from the fact that the Company did not have a collective-bargaining agreement with the [union]." 177 NLRB at 503. In effect, the union is "using its internal working rules to boycott an employer who [does] not have a contract with the [union] by making it a violation, subject to fine, for its members to work for such an employer." *Id.* at 502.

7. Testimony at the hearing suggested that Local 323 may indeed have had an interest in representing Drexel's employees. Hearing

Transcript at 44, 194, 403–05, 422. If so, the union's assessment of a penalty against Willey violated the statute even under the test posited by the Ninth Circuit. The ALJ and the Board, however, made no finding on the issue.

8. The Board claims that the Union has foreclosed our consideration of this argument because it did not raise the defense during the administrative proceedings. *See* 29 U.S.C. § 160(e). To the contrary, the Union preserved the contention in its exceptions to the ALJ's decision, which were submitted three months prior to the Ninth Circuit's issuance of the *Chewelah* opinion. There, the Union emphasized that it did not represent Drexel's employees, thereby rendering the sanction an internal union matter outside the scope of § 8(b)(1)(B).

9. In *American Broadcasting Cos.,* Justice Stewart in dissent underscored this implication of the majority's holding. As he observed,

[i]n the present cases it is entirely clear that the union had no interest in restraining or coercing the employers in the *selection* of their bargaining or grievance adjustment representatives, or in affecting the *manner* in which supervisory employees performed those functions. As the Court notes, ... the union expressed no interest at the disciplinary trials in the kind of work that was done behind its picket lines. Its sole purpose was to enforce the traditional kinds of rules that every union relies on to maintain its organization and solidarity in the face of the potential hardship of a strike.

437 U.S. at 440, 98 S.Ct. at 2439, 57 L.Ed.2d at 334 (citations omitted) (emphasis in original).

■ Placing the emphasis on the effect caused by the union's actions, rather than its intent, is more consistent with the fundamental purpose of the statute. Congress' overriding concern in enacting § 8(b)(1)(B) was to insulate an employer's *selection* of his collective bargaining or grievance adjustment representative from union influence or interference. *See, e.g., Florida Power & Light,* 417 U.S. at 803, 94 S.Ct. at 2744, 41 L.Ed.2d at 487. An attempt to force a member-supervisor to cease working for a nonunion company demonstrably infringes on the employer's right to choose that person as its representative. *See A.S. Horner,* 177 NLRB at 502. In view of that inevitable result, even a union endeavoring only to enforce an internal regulation, and not primarily motivated to influence an employer's selection, can deprive the employer of the protection afforded by the statute. Consequently, we find the *Chewelah* limitation inconsistent with the central aim of § 8(b)(1)(B).

Next, the Union attempts to escape the dictates of the statute by characterizing Willey as an "employer." The Union reasons that the use of the master's certificate to obtain electrical permits is a responsibility more akin to an employer, rather than a supervisory, function. Then, claiming that it disciplined Willey primarily for his use of the certificate, the Union urges that the statute does not condemn sanctions imposed on a member for engaging in strictly employer activities.

It is true that the Board has consistently held § 8(b)(1)(B) inapplicable in cases where the member is the owner of the business. *See, e.g., Glaziers and Glassworkers, Local 1621,* 221 NLRB 509 (1975). In analyzing whether the member-supervisor is indeed the employer, and thus unprotected by the statute, the Board focuses on the extent, if any, of the individual's financial ownership in the company. *See* 221 NLRB at 513. The reason for this rule is apparent. When a person has a financial self-in-terest in the enterprise, "it is difficult to envision circumstances where the employer would be greatly influenced in the performance of his grievance-adjustment or collective-bargaining functions where any decision he makes in those respects directly works to his benefit or detriment depending on how he decides it." *Id.* NLRB at 512. Moreover, the application of § 8(b)(1)(B) in that situation would, through the subterfuge of protecting the employer's selection of his representative, effectively deprive a union of all economic weapons, merely because the employer assumes the additional role of a supervisor. As the Board has noted, Congress certainly did not intend that result. *See id.* at 512–13.

The Union's assertion that Willey's mere use of the master's certificate places him within the ambit of this rule misconstrues its rationale. Essentially, the Union confuses ownership with management duties. Supervisory personnel, by their very nature, often undertake numerous tasks closely associated with an employer's role, such as Willey's acquisition of electrical permits in this case. In effect, a supervisor acts as a managerial agent for the employer. However, this responsibility does not necessarily create the personal stake inevitably present when the individual possesses a financial interest in the company. Without that participation, there is no assurance that union pressure will not adversely affect the supervisor's performance of his collective-bargaining and grievance-adjustment duties. Thus, managerial responsibility, standing alone, does not negate the applicability of § 8(b)(1)(B).

■ On that basis, the Union's argument must fail. The uncontroverted testimony before the ALJ established that Willey owned no stock or other financial interest in Drexel. Without such a personal stake, his responsibility in obtaining electrical permits does not justify an exemption from the statute's coverage.[10]

The order of the Board is ENFORCED.

10. Implicit in this approach is a related contention based on the Union's characterization of the master's certificate as an "employer func-tion." It essentially claims that since *Florida Power & Light* construes the statute only to prohibit sanctions imposed for the exercise of

supervisory duties, and use of the master's license is an employer rather than a supervisory undertaking, discipline for that purpose does not offend § 8(b)(1)(B). As previously noted, we are unconvinced by the Union's attempt to distinguish between employer and supervisory functions, in that the distinction ignores the inherently managerial nature of a supervisor's role. Moreover, mere labels do not control the existence or absence of a violation. *See American Broadcasting Cos.,* 437 U.S. at 430, 98 S.Ct. at 2484, 57 L.Ed.2d at 328 (not all discipline imposed for performance of "supervisory work" is necessarily unlawful). Rather, the inquiry focuses on the *effect* of the discipline on the employer's selection of a representative to perform the pertinent duties. The Board found an equal adverse effect in the sanctions imposed for using the certificate as it did with the discipline resulting from Willey's association with a nonunion employer. As the Board noted, "[i]t is part and parcel of the same violation." Recognizing that this finding of the requisite effect is "peculiarly the kind of determination that Congress has assigned to the Board," *American Broadcasting Cos.,* 437 U.S. at 432, 98 S.Ct. at 2435, 57 L.Ed.2d at 330, we see no reason to disturb the Board's conclusion.