708 F.2d 313
 113 L.R.R.M. (BNA) 2815, 97 Lab.Cas. P 10,208
 CHAUFFEURS & HELPERS LOCAL UNION NO. 50, affiliated with
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, a labor organization,
Plaintiff-Appellant,
v.
McCARTIN-McAULIFFE MECHANICAL CONTRACTOR, INC., a corp.,
Defendant-Appellee.
 No. 80-1261.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 18, 1983.
Decided June 1, 1983.
 
 Nancy Watkins, Wiley, Craig, Armbruster, Wilburn & Mills, St. Louis, Mo., for plaintiff-appellant.
 Thomas G. Harvel, Westervelt, Johnson, Nicoll & Keller, Peoria, Ill., for defendant-appellee.
 Before BAUER, WOOD and POSNER, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This controversy originally arose as a jurisdictional dispute between Chauffeurs, Warehousemen and Helpers Local Union No. 50 affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters"), and Local Union No. 653 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U.S. and Canada ("Pipefitters"). The sole issue was the manning of one service truck used to transport pipefitters, their tools and equipment about four blocks per day to and from the job site of McCartin-McAuliffe Mechanical Contractor, Inc. ("Contractor") in Centralia, Illinois.
 
 
 2
 The Contractor took the position that the truck became a part of the tools of the trade as provided by its agreement with the Pipefitters, and therefore a pipefitter should drive the truck. The Teamsters disagreed, threatened to strike over the issue, and then filed a grievance under its collective bargaining agreement. The grievance reached the Joint Committee[1] which, on July 12, 1978, sustained the grievance and directed the Contractor and the Teamsters to work out the resulting economic settlement. The Pipefitters were not represented in the Teamsters' grievance proceeding. About a week thereafter, the Contractor filed a charge with the National Labor Relations Board, Region 14, in Case No. 14-CD-556, alleging that the Teamsters had violated Section 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(4)(D). However, before the case could go to a Board-conducted 10(k) hearing, 29 U.S.C. Sec. 160(k),[2] the parties voluntarily executed a Settlement Agreement on August 8, 1978, which was approved by the Board's Regional Director.[3] As a result, neither a hearing nor a Board determination was necessary to resolve the dispute out of which the alleged unfair labor practice arose.
 
 
 3
 About nine months later Teamsters filed this suit under Section 301, 29 U.S.C. Sec. 185, to enforce the July 12, 1978 arbitration award. The Contractor moved to dismiss the suit on the grounds that the Settlement Agreement resolved the entire dispute and superseded the arbitration award. On January 30, 1980, the district court allowed the motion without comment.
 
 
 4
 It is the position of Teamsters that the Settlement Agreement was merely an acknowledgment by Teamsters that it would refrain from any conduct unlawful under 29 U.S.C. Sec. 158(b)(4)(ii)(D)[4] and was not a settlement of the underlying dispute. That being so, it is argued, the arbitration award retains its vitality and should be enforced. In contrast, the Contractor argues that the Agreement was a "voluntary adjustment" under Section 10(k) which settled the entire dispute. Since a Board decision pursuant to a Section 10(k) hearing takes precedence over an inconsistent arbitral decision, Local 7-210, Oil, Chemical and Atomic Workers v. Union Tank Car Co., 475 F.2d 194 (7th Cir.), cert. denied, 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973); New Orleans Typographical Union v. NLRB, 368 F.2d 755 (5th Cir.1966), the Contractor maintains that a Board-approved "adjustment" has the same effect.
 
 
 5
 Teamsters agree that a Board determination supersedes an inconsistent arbitral award. Nevertheless, it claims that since the Board did not conduct a full hearing on the merits, Teamsters are free to proceed under Section 301 to demand compliance with the contractually mandated arbitral award. Teamsters also concede that the Board believed the Contractor had correctly assigned the work and that the entire matter was concluded. Teamsters, however, argue that regardless of those perceptions, they did not agree to abandon the alternative remedy of pursuing grievance-arbitration.
 
 
 6
 To support its position, Teamsters primarily rely on Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). The Court in Carey states that the National Labor Relations Act "does not deal with the controversy anterior to a strike nor provide any machinery for resolving such a dispute absent a strike." 375 U.S. at 263, 84 S.Ct. at 404. However, the Court goes on to explain that a threat of a strike, as we have in the present case, gives the Board authority under Section 10(k) to resolve the dispute. 375 U.S. at 263-64, 84 S.Ct. at 404-05.
 
 
 7
 Carey also is a different case on the facts. A union filed a grievance under a collective bargaining agreement in a dispute which was not clearly either a jurisdictional dispute over which workers should perform certain tasks, or a controversy as to which union should represent the employees doing particular work. The company refused to arbitrate on the ground that the controversy presented a matter for the Board. The union sued to compel the company to arbitrate. Carey is not a situation where, after an undisputed threat to strike in a purely jurisdictional dispute, the parties enter into a Board-approved settlement. Under such circumstances, the underlying dispute is governed by Section 10(k), and the fact it is resolved by a "voluntary adjustment" approved by the Board, rather than by a Board determination, has no inherent effect on either the validity or scope of a settlement agreement.[5]
 
 
 8
 New Orleans Typographical Union No. 17 v. NLRB, 368 F.2d 755 (5th Cir.1966), also cited by Teamsters, is of little help in deciding the present case. In New Orleans the parties disputed whether the union's strike objective was to force an assignment of work and thus whether the Board could settle the underlying dispute in the pending Section 10(k) hearing. The Fifth Circuit held that the district court was not required to stay Section 301 proceedings to compel arbitration under the collective bargaining agreement until the Board held the Section 10(k) hearing--even though any subsequent Board determination would take precedence over an inconsistent arbitral award. Based on that case, Teamsters argue that since a court is not divested of Section 301 jurisdiction while a matter is pending before the Board, a fortiori a court may enforce an arbiter's award where, as here, there is no pending Board determination.
 
 
 9
 This argument overlooks the Settlement Agreement voluntarily entered into. In New Orleans arbitration was permitted to proceed so there would be an expeditious resolution of the dispute in the event the Section 10(k) hearing could not resolve it. Here the Board approved a "voluntary adjustment" because it believed it settled the entire dispute and made a Section 10(k) hearing unnecessary. Consequently, the fact there is no pending Board determination suggests the matter is settled, not that arbitration is available or necessary to resolve it. In Carey the Supreme Court has expressed a preference to avoid "fragmentation" and has encouraged conciliatory measures, deemed vital by Congress to industrial peace, "which may be dispositive of the entire dispute." 375 U.S. at 272, 84 S.Ct. at 409. Thus, absent express terms to the contrary, we cannot presume that a "voluntary adjustment" which is submitted to and approved by the Board, fails to resolve the underlying jurisdictional dispute and results in nothing more than an agreement to refrain from conduct prohibited under Section 8(b)(4)(D).
 
 
 10
 We do not, however, need to rely solely on the Board's approval to conclude that the Settlement Agreement disposes of all matters relating to the jurisdictional dispute. The conduct of the parties also indicates that both the Contractor and the Board had every reason to believe that a full settlement was the intended effect of the Agreement. Following the signing of the Agreement, Teamsters proceeded to post notices agreeing not to threaten, restrain, or coerce the Contractor for the purpose of forcing the Contractor to assign the work of driving the service truck to a teamster. Neither the terms of the Agreement nor the notices indicate that Teamsters intended to reserve any matters for resolution by alternative means. Moreover, by their nine-month delay in raising the issue after the Agreement was signed, it appears that even the Teamsters may have considered the dispute fully settled until, as an afterthought, they decided to see if something still could be salvaged from the Agreement. We see no justification for this fragmentation of the dispute and its continued disruption of "industrial peace."
 
 
 11
 The Settlement Agreement was not as clear and complete as it might have been, but considered in light of the language of Section 10(k), and the evident belief of the Contractor and the Board, if not also the Teamsters, we see no reason to reopen the controversy. The whole purpose of Section 10(k) was to enable the Board to permanently settle work assignment disputes in jurisdictional contests between two unions which damage an employer who cannot satisfy both unions. The arbitration procedure may have been sufficient to solve the problem, but the Teamsters abandoned that by their admitted threat to strike. The powers of the Board were then needed under Section 10(k) to determine the dispute out of which the strike threat arose. We need not speculate how the Board alone would have resolved the matter after a hearing, because the parties voluntarily assisted the Board by settling and disposing of the unfair labor charge which took with it the underlying dispute.
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 Article 19 of the agreement between the Teamsters and the Contractor provides that unresolved grievances are to be submitted to a Joint Committee consisting of equal numbers of representatives of contractor and local union parties to the association agreement. The Joint Committee's resolution of disputes between an employer and a local union is binding on the parties
 
 
 [2]
 29 U.S.C. Sec. 160(k) provides:
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.
 
 
 [3]
 By the terms of the Settlement Agreement the Teamsters agreed:
 We will not threaten, restrain or coerce McCartin-McAuliffe Mechanical Contractor, Inc., or any other person engaged in commerce or in any industry affecting commerce where an object thereof is forcing or requiring McCartin-McAuliffe Mechanical Contractor, Inc., to assign the work of driving the service, or welding, truck to employees who are members of or represented by Teamsters Local Union No. 50, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, rather than to employees who are members of or represented by Local Union No. 653 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, unless and until Teamsters Local Union No. 50 a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America is certified by the Board, or the Board orders McCartin-McAuliffe Mechanical Contractor, Inc., to bargain with Teamsters Local Union No. 50, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America as the representative of employees performing such work.
 
 
 [4]
 29 U.S.C. Sec. 158(b)(4)(ii)(D) provides in pertinent part:
 (b) It shall be an unfair labor practice for a labor organization or its agents--
 (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.
 
 
 [5]
 Cf. International Assn. of Ironworkers Local 395 v. United Brotherhood of Carpenters, 347 F.Supp. 1377 (N.D.Ind.1972) (losing party in Sec. 10(k) hearing could not seek contract damages under Sec. 301 pursuant to an arbitration award where plaintiff claimed its compliance with the Board's determination only meant it would refrain from forcing the employer to assign work by means proscribed in Sec. 8(b)(4)(D))