749 F.2d 1242
 118 L.R.R.M. (BNA) 2001, 102 Lab.Cas. P 11,277
 PEPPER CONSTRUCTION COMPANY, Plaintiff-Counterdefendant-Appellant,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150,
Defendant-Counterplaintiff-Appellee.
 No. 83-2684.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 24, 1984.
Decided Dec. 12, 1984.
 
 Michael W. Duffee, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiff-counterdefendant-appellant.
 Roger N. Gold, Gold & Polansky, Chicago, Ill., for defendant-counterplaintiff-appellee.
 Before PELL and ESCHBACH, Circuit Judges, and WYATT, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 Appellant, Pepper Construction Company (Pepper), plaintiff-counterdefendant below, appeals from a district court order denying its motion for summary judgment and granting summary judgment to appellee, International Union of Operating Engineers, Local 150 (Local 150). The primary issue on appeal is whether a disclaimer made by a union at a section 10(k) hearing before the National Labor Relations Board (the Board) precludes that union from enforcing, up to the time of the disclaimer, a back pay award previously entered by a joint grievance committee.
 
 I. THE FACTS
 
 2
 A. The Collective Bargaining Agreement.
 
 
 3
 Pepper was a prime contractor for a renovation project at Marshall Field & Company (Field's) State Street store in Chicago, Illinois. Pepper also has been a member of a builders' association that entered a collective bargaining agreement in 1981 with Local 150 concerning working conditions. The builders' association and Local 150 had negotiated similar agreements since 1966. The 1981 contract contained several provisions relevant to the present controversy. The scope-of-work section provided that the contract applied, inter alia, to "[c]onstruction, erection, modification, addition to or improvement of a building structure or structures." The branches-of-work provision in the agreement stated that "the operation of all engines and boilers on building and construction work operated by ... any ... motive power, including, but not limited to ... all elevators used for building construction or for alteration work, shall be the work of the operating engineers." Furthermore, the agreement provided that, with certain exceptions not applicable here, "[e]levators of all types shall require an engineer." The agreement also contained a union shop provision, which stated: "When an employer performs work covered by this Agreement, ... the employer will obtain all employees used in the performance of such work through the referral offices of the local union...."
 
 
 4
 The dispute-resolution provisions of the agreement apply to "any claim or dispute involving an interpretation or application of the Agreement." Step three of the grievance procedure requires submission of an unresolved dispute to a Joint Grievance Committee (the Committee) composed of an equal number of representatives from both Local 150 and Pepper. The contract empowered the Committee "to resolve all grievances before it," and, if the Committee resolved the dispute, "no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this Agreement."
 
 
 5
 B. The Grievance.
 
 
 6
 Pepper started doing maintenance work for Field's in 1937. Since then, Pepper has done all routine maintenance and construction work for Field's. In early October of 1981, Pepper began work as prime contractor on a major renovation project. The contract between Pepper and Field's provided that Field's employees would perform all elevator services. Field's, in turn, had a collective bargaining agreement with Local 372 of the Service Employees International Union (Local 372), which required the assignment to Local 372 members of all elevator work on Field's premises. Field's has never had a collective bargaining agreement with Local 150, nor has Pepper had an agreement with Local 372.
 
 
 7
 There are ten freight elevators at various locations in Field's State Street store. A number of factors account for the fact that, with insignificant exceptions, Field's has never ceded control of any elevators to construction projects. First, the elevators are of different shapes and sizes and do not all stop at every floor. Consequently, depending upon the dimensions and destination of a given load, any of the elevators might be needed for regular store work. Second, Field's contract with Local 372 required Field's to assign all elevator operations to members of Local 372. Third, because the primary function of the store is to sell merchandise, the movement of inventory has priority over all other uses of the elevators. Finally, the frequent breakdown of the elevators requires constant adjustment of internal freight-movement schedules. As a result, Field's has found it impossible to set aside any particular elevator for a single-purpose use.
 
 
 8
 Between 1966, when Pepper and Local 150 first entered into a collective bargaining agreement, and 1981, Local 150 never complained about the failure of Pepper to assign members of Local 150 to elevator operations at any renovation sites, including Field's. In late October 1981, however, Local 150 complained to Pepper and demanded that Pepper assign the operation of elevators at the Field's construction site to Local 150 members. A meeting ensued between representatives of Pepper, Field's, and Local 150. Field's noted that it had a collective bargaining agreement that granted to Local 372 the exclusive operation of all freight elevators. Similarly, Pepper claimed that, because it had no control over the operations of Field's elevators, it could not comply with Local 150's demand. Shortly thereafter, however, Pepper requested Field's approval to use a Local 150 member on the elevators or to build a new hoist on the outside of the building for construction purposes. Field's refused both requests, the first due to its contract with Local 372 and the second due to the cost of building a new hoist, the safety hazard and impediment to pedestrian traffic that such a hoist would present, and the negative aesthetic effect of an exterior hoist.
 
 
 9
 On November 11, 1981, Local 150 notified Pepper that it had filed a formal grievance due to Pepper's failure to assign a Local 150 member to the operation of the elevators, which, Local 150 claimed, constituted bargaining unit work under the collective bargaining agreement. Neither Field's nor Local 372 was involved in the grievance proceeding. On January 26, 1982, the Joint Grievance Committee ruled in favor of Local 150 and ordered Pepper to assign the work to a Local 150 member and make a back pay award from the time when Local 150 first complained about the work assignment. On January 29, Pepper wrote to Field's seeking to gain compliance with the Committee's award. Field's then wrote to Local 372 to see if it could comply with Pepper's request, but Local 372 refused and stated: "If it should come to pass, we would immediately implement any and all of those remedies available to us under the contract, and the National Labor Relations Act which may include picketing and other forms of job action." Field's thereupon denied Pepper's request of January 29.
 
 
 10
 On March 2, 1982, Pepper filed an unfair labor practice charge against Local 372. The charge, brought under section 8(b)(4)(D) of the National Labor Relations Act (the Act), 29 U.S.C. Sec. 158(b)(4)(D), alleged that Local 372 had threatened Field's with the purpose of forcing Pepper and Field's to assign the disputed work to Local 372 rather than Local 150. At the culmination of the hearing held before the Board Hearing Officer on March 30 and April 2, counsel appearing in the proceeding on behalf of Local 150 stated: "Local 150 would now disclaim any claim to the working dispute." In its brief to the Board following the hearing, Local 150 asserted that the disclaimer terminated any work dispute between itself and Local 372 and, consequently, deprived the Board of further jurisdiction under section 10(k) of the Act, 29 U.S.C. Sec. 160(k), as interpreted by the Supreme Court. Pepper's brief urged the Board to retain jurisdiction, in part because the disclaimer did not include an express withdrawal of Local 150's grievance or abandonment of the back pay award entered by the Committee. Pepper also claimed that Local 150 was manipulating the section 10(k) proceedings to avoid an authoritative determination of the merits of Pepper's claim.
 
 
 11
 On April 26, 1982, after the hearing but before a Board decision, Pepper filed a section 301 complaint, 29 U.S.C. Sec. 185(a), in federal court to vacate the Committee's award to Local 150. Local 150 counterclaimed for enforcement of the award. Neither party informed the Board of the pendency of the district court case. The Board issued its opinion on the section 10(k) proceeding on July 12, 1982, quashing the notice of hearing. The Board relied upon prior Board rulings that had held that a jurisdictional dispute ceases to exist when one of the competing unions effectively renounces its claim to the disputed work. Despite Pepper's concern with the fact that Local 150 had not expressly abandoned the back pay award, the Board explicitly found that Local 150's disclaimer was unequivocal. The Board also found that Local 150 had taken no action inconsistent with a good faith disclaimer. As a result, the Board concluded that "there no longer exists a jurisdictional dispute within the meaning of the Act." 262 N.L.R.B. 815 (1982).
 
 
 12
 In the district court proceeding, each party filed a motion for summary judgment. On July 14, 1983, the district court granted summary judgment in favor of Local 150. The court rejected Pepper's claim that Local 150's disclaimer estopped it to seek enforcement of the back pay award. The trial judge determined:
 
 
 13
 There is no evidence that Local 150 ever indicated that it was making the disclaimer retroactive to the commencement of the dispute with Pepper, and it appears that Pepper fully realized this when Pepper attempted to persuade the NLRB in its brief that the disclaimer was ineffective. When it is realized that Local 150 is seeking to enforce the back pay award only until the date of the disclaimer, viz., April 1, 1982, it is difficult to perceive any inconsistency in Local 150's position.
 
 
 14
 C. Positions on Appeal.
 
 
 15
 On appeal, Pepper asserts that the district court erred when it held that the disclaimer did not preclude Local 150 from enforcing the back pay award. Pepper notes that the award arose out of the same jurisdictional dispute that gave rise to the section 10(k) proceeding. Pepper also maintains that the only reason that the Board quashed the notice of the section 10(k) hearing was due to the unequivocal nature of Local 150's disclaimer. The disclaimer contained no express reservation of a right to enforce the back pay award. Pepper claims that the Board never would have quashed the notice of hearing if it had known that Local 150 would seek to enforce the back pay award. Thus, Pepper concludes that, because the back pay award and the section 10(k) hearing arose from the same jurisdictional dispute and because the Board found that Local 150's disclaimer in the section 10(k) hearing was unequivocal, the disclaimer precludes Local 150 from collecting the back pay award. It is Pepper's position, therefore, that the disclaimer applied retroactively to encompass any claim arising from the work dispute. Furthermore, Pepper argues that the district court's contrary conclusion, that enforcement of the back pay award was not inconsistent with the disposition of the section 10(k) hearing, is not supported by the evidence and subjects Pepper to the contradictory interunion demands that sections 8(b)(4)(D) and 10(k) were designed to eliminate.
 
 
 16
 Local 150, not surprisingly, finds no fault with the conclusion and rationale of the district court. Specifically, Local 150 asserts that the disclaimer did not include the abandonment of the back pay award and, thus, that enforcement of the award was consistent with the disclaimer. In essence, the union claims that the disclaimer applied only prospectively from the date of the Board hearing. Consequently, the union argues that, because no further work dispute existed, which terminated the Board's jurisdiction under section 10(k), nothing foreclosed enforcement of the back pay award.
 
 II. THE DECISION
 
 17
 This case presents an issue of first impression. Neither any federal court nor the Board has addressed the question of the effect of a disclaimer on a previously entered back pay award. The propriety of the Board's decision to quash the section 10(k) hearing is not before us; rather, we must review the district court's decision to enforce the arbitration award. Specifically, the district court held that there was nothing inconsistent in Local 150's actions of disclaiming any interest in the work dispute while continuing to seek enforcement of the back pay award. Despite the narrowness of the issue on appeal, a summary of the law with respect to disclaimers in section 10(k) proceedings provides guidance for the resolution of the issue in this case.
 
 
 18
 Section 8(b)(4)(D) of the Act makes it an unfair labor practice for a union to engage in or induce a strike or to threaten an employer, where in either case the purpose is to force the employer to assign work to employees of that union rather than another labor organization. Section 10(k) provides the mechanism for resolving unfair labor practice charges brought under section 8(b)(4)(D). Section 10(k) empowers the Board to determine the dispute out of which the charge arose, unless the parties agree upon a method for the voluntary adjustment of the dispute. The labor unions involved in the present case were not parties to any joint resolution board, which would constitute a method of voluntary dispute adjustment. Initially, therefore, the Board correctly took jurisdiction over Pepper's section 8(b)(4)(D) claim against Local 372.
 
 
 19
 Over twenty years ago, the Board first ruled that an effective renunciation by one of the unions involved in a jurisdictional dispute terminates section 10(k) proceedings. Highway Truckdrivers, Local 107 (Safeway Stores, Inc.), 134 N.L.R.B. 1320 (1961) (known as the Safeway rule). The Board has consistently adhered to the Safeway rule. Local 8, International Association of Bridge Workers, 267 N.L.R.B. No. 122 (1983); United Association of Journeymen of the Plumbing Industry, Local 262, 252 N.L.R.B. 48 (1980). The Supreme Court tacitly approved the Safeway rule in NLRB v. Plasterers' Local Union No. 79, 404 U.S. 116, 134-35, 92 S.Ct. 360, 371-72, 30 L.Ed.2d 312 (1971). In the Plasterers' case, the Court stated that the comparative function served by a section 10(k) proceeding "evaporates when one of the unions renounces and refuses the work." Id. at 135, 92 S.Ct. at 371.
 
 
 20
 Despite the settled nature of the Safeway rule, the question still remains as to what constitutes an effective disclaimer. In recent decisions, the Board has found a variety of purported disclaimers ineffective, thus revealing the restrictive interpretation that the Board gives to disclaimers. For instance, the Board has found a disclaimer ineffective where the union repeatedly claimed the disputed work, but subsequently disclaimed the work before the Board could make a determinative decision. Local 701, International Brotherhood of Electrical Engineers, 255 N.L.R.B. 1157 (1981), enforced, 703 F.2d 501 (11th Cir.1983). Furthermore, in a case in which one union asserted that it claimed no particular work, but merely sought compliance with its collective bargaining agreement with the employer, while the second union alleged that it had no dispute with the first, the Board nonetheless found the reciprocal disclaimers ineffective. The Board accordingly refused to give effect to the disclaimers, which would otherwise have resulted in the employer making payments to both unions while only one performed any work. Laborer Union No. 100 of the Laborers International Union, 267 N.L.R.B. No. 192 (1983). Likewise, the Board also has held that, if a union conditions a disclaimer to particular work upon the statement that it may seek similar work in the future, then the Board will not give effect to the disclaimer. Local 1294, International Longshoremen's Association, 257 N.L.R.B. 403 (1981). But see International Brotherhood of Electrical Workers, Local 640, 228 N.L.R.B. 1078 (1977), aff'd sub nom. Stromberg-Carlson Communications, Inc. v. NLRB, 580 F.2d 939 (9th Cir.1978). Finally, in a case in which the union did not disclaim disputed work until the end of the Board hearing, which occurred after most of the work was finished, the Board refused to give any effect to the disclaimer. Sprinkler Fitters Local 703, 261 N.L.R.B. 1122 (1982).
 
 
 21
 Two broad principles underlie the Board's decisions in these disputes. First, "[t]he Board has found that a disclaimer of work in a jurisdictional dispute cannot be given effect if it appears that the [disclaiming] union is engaging in the practice of a hollow disclaimer for the purpose of avoiding an authoritative decision on the merits." Local 701, International Brotherhood of Electrical Workers, 255 N.L.R.B. at 1160. As a result, the Board will not allow a union to manipulate its Safeway rule in order to harass an employer with successive jurisdictional claims and yet avoid a definitive resolution of the underlying dispute. Second, the Board narrowly interprets disclaimers in section 10(k) proceedings. Consequently, the Board imposes upon the disclaiming party the burden to establish "a clear, unequivocal, and unqualified disclaimer of all interest in the work in dispute." International Union of Operating Engineers, Local No. 77, 257 N.L.R.B. 436, 439 (1981) (emphasis added).
 
 
 22
 In the present case, this court must view the Board's acceptance of the disclaimer by Local 150 in light of the approach taken by the Board to questions concerning the effectiveness of disclaimers. The district court should have taken the same view. We must assume from the Board's acceptance of the disclaimer that the Board found that Local 150 did not make a hollow disclaimer to avoid an authoritative determination of the issues; rather, the Board must have found that Local 150 made "a clear, unequivocal, and unqualified disclaimer of all interest in the work in dispute." Id. Certainly, the back pay award constituted one aspect of the work dispute in this case. Both the back pay award entered by the Joint Committee and the prospective work assignment before the Board involved the same dispute.
 
 
 23
 We also note that the union disclaimed "any claim" to the work in dispute. (Emphasis added.) Thus, Local 150 did not manifest any intention to pursue the back pay award. Similarly, in its brief to the Board after the section 10(k) hearing, Local 150 reiterated that it had "unequivocally disclaimed the work in question." Yet, once again, Local 150 failed to indicate any intention of continuing to seek enforcement of the back pay award. Perhaps out of an excess of caution, Pepper urged the Board to reject the disclaimer because of the union's failure to renounce expressly any right to receive payment of the award. We do not regard Pepper's assertion before the Board as precluding the force of its argument on appeal that the disclaimer does preclude enforcement of the award. In light of the Board's reluctance to find disclaimers to be unequivocal, we agree with Pepper that the fact that the Board found the disclaimer in this case to be unequivocal indicates that the Board interpreted the disclaimer as encompassing the back pay award. Consequently, we hold that the district court erred in holding that there was nothing inconsistent between the union's disclaimer and its attempt to enforce the award.
 
 
 24
 The unequivocal terms of the disclaimer, as well as the failure of Local 150 to indicate that it would seek enforcement of the award, lead us to conclude that the Board found the disclaimer to apply to the award. The subsequent attempt by Local 150 to enforce the award does not retroactively transmogrify the unequivocal disclaimer into a partial disclaimer that preserved the right to receive back pay.
 
 
 25
 We find support for our conclusion in this court's recent decision in Chauffeurs & Helpers Local Union No. 50 v. McCartin-McAuliffe Mechanical Contractor, Inc., 708 F.2d 313 (7th Cir.1983). The McCartin-McAuliffe case involved a jurisdictional dispute between Local 50 and Local 653. The employer gave the work to Local 653. Local 50 threatened to strike and then processed a grievance, in which Local 653 was not involved. Local 50 prevailed in the arbitration. The employer then filed a section 8(b)(4)(D) charge against Local 653, but the parties settled the dispute before the section 10(k) hearing. Although there was no Board determination in the conventional sense, the Board did approve the settlement. Nine months later, Local 50 sued to enforce the arbitrator's award. We affirmed the district court's decision to grant the employer's motion to dismiss. In light of both Local 50's threat to strike and the Board-approved settlement, "the underlying dispute is governed by Section 10(k), and the fact it is resolved by 'voluntary adjustment' approved by the Board, rather than by a Board determination, has no inherent effect on either the validity or scope of a settlement agreement." Id. at 315. We also noted that the Board would not have approved the settlement unless the Board believed that it settled the entire dispute, because the purpose of section 10(k) is to produce a permanent settlement. Id. at 315-16. Finally, we noted that "[n]either the terms of the Agreement nor the notices indicate that [Local 50] intended to reserve any matters for resolution by alternative means." Id. at 316.
 
 
 26
 Due to the differences in circumstances, McCartin-McAuliffe does not provide binding precedent for this case; nonetheless, it does provide instructive guidance. There are two significant factual differences between McCartin-McAuliffe and the present case. First, Local 50 waited nine months after the settlement before it sought enforcement of the arbitration award, while the union in this case sought enforcement even before the Board accepted the disclaimer, although the Board was not informed of those enforcement efforts. Second, while the parties in McCartin-McAuliffe resolved their dispute by a Board-approved settlement, in the present case Local 150's disclaimer resulted in the termination of the section 10(k) proceedings. Neither of these differences detracts from the forcefulness of the rationale set forth in McCartin-McAuliffe. As with the settlement in McCartin-McAuliffe, the Board would not have accepted Local 150's disclaimer if it had failed to resolve the entire dispute. The method of resolution does not affect the scope of the resolution's effect because the Board accepted both the settlement in McCartin-McAuliffe and the disclaimer in this case. Finally, the terms of the disclaimer failed to indicate an intent to reserve any element of the dispute for resolution by alternative means. Therefore, the district court should have given the disclaimer its full effect and held that Local 150's attempt to enforce the back pay award was inconsistent with the Board's determination, reached before the court's ruling on the summary judgment motions, that the disclaimer was unequivocal. Consequently, we conclude that the district court erred in granting Local 150's motion for summary judgment and denying Pepper's similar motion.
 
 
 27
 Pepper's second basis for appeal is its claim that the award of the Joint Grievance Committee cannot be enforced because the award failed to draw its essence from the collective bargaining agreement. In light of our disposition of the disclaimer issue, we need not reach this argument, and we express no opinion about the district court's determination of the issue.
 
 
 28
 The district court's judgment is VACATED and the cause is REMANDED with instructions to enter judgment in favor of Pepper.
 
 
 
 *
 Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation